

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-18-2004

# Spruill v. Gillis

Precedential or Non-Precedential: Precedential

Docket No. 02-2659

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Spruill v. Gillis" (2004). *2004 Decisions*. Paper 547.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/547

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

No. 02-2659

_____

ROBERT SPRUILL,

*Appellant*

v.

FRANK GILLIS; GOOLIER, C.O.;
MCGLAUGHLIN, M.D.; BROWN, P.A.

_____

On Appeal From The United States
District Court For
The Middle District Of Pennsylvania
(D.C. No. 3:01-CV-1625)
District Judge: Honorable Thomas I.
Vanaskie, Chief Judge

_____

Argued January 13, 2004

Before: ALITO, CHERTOFF, and
BECKER Circuit Judges.

(Filed: June 18, 2004)

ERIC R. SONNENSCHEIN (Argued)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

*Attorney for Appellant*

MICHAEL A. FARNAN (Argued)
Department of Corrections
Office of Chief Counsel
P.O. Box 598
Camp Hill, PA 17011

*Attorney for Appellees Gillis and Goolier*

ALAN S. GOLD (Argued)
Sean Robins
Gold, Butkovitz & Robins
7837 Old York Road
Elkins Park, PA 19027

*Attorney for Appellees McGlaughlin and
Brown*

_____

OPINION
_____

BECKER, *Circuit Judge.*

This appeal raises important questions of construction of the Prison Litigation Reform Act of 1995 (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 at 66 (1996). Plaintiff Robert Spruill is an inmate in the custody of the Pennsylvania Department of Corrections. Spruill filed a civil rights complaint under 42 U.S.C. § 1983 against four defendants at the State Correctional Institution at Coal Township, Pennsylvania: two prison officials (Frank Gillis and Stephen Gooler[1]); a prison doctor (Dr. Shawn McGlaughlin); and a

_____

[1]Spruill in his complaint spells the name "Goolier," but we will use the correct spelling, "Gooler."

prison physician's assistant (Brian Brown). In his complaint, Spruill alleges that, as a result of the deliberate indifference of the defendants, his serious back condition was left untreated, or was inadequately treated, resulting in excruciating pain and susceptibility to other injuries. Pursuant to Pennsylvania's Inmate Grievance System Policy (the "Grievance System Policy"), Spruill filed a series of three inmate grievances, and he ultimately received some measure of medical care. In his grievances, Spruill did not seek money damages, but in the instant suit under 42 U.S.C. § 1983, he does seek money damages for the alleged violation of his rights under the Eighth Amendment to the United States Constitution.

42 U.S.C. § 1997e(a), enacted as part of the PLRA, provides that a prisoner may not bring a § 1983 suit with respect to prison conditions "until such administrative remedies as are available are exhausted." Because Spruill had failed to seek money damages in his grievances, the District Court concluded that he had failed to meet the exhaustion requirement of § 1997e(a), and therefore dismissed Spruill's suit in its entirety. The District Court also held in the alternative that Spruill's failure to name Brown in his grievances constituted a failure to exhaust his claims against Brown. Spruill appeals the dismissal of his claims against Gooler, Dr. McGlaughlin, and Brown. He does not appeal the dismissal of his suit against Gillis.

Courts have only recently begun to define the contours of the PLRA's exhaustion requirement, and we have not had occasion to pass on whether the exhaustion requirement is merely a termination requirement or also includes a procedural default component—that is, whether a prisoner may bring a § 1983 suit so long as no grievance process remains open to him, or whether a prisoner must properly (i.e., on pain of procedural default) exhaust administrative remedies as a prerequisite to a suit in federal court. This case requires us to confront that issue, and we hold that § 1997e(a) includes a procedural default component. We further hold that the determination whether a prisoner has "properly" exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials.

Applying this framework to Spruill's grievances under the Grievance System Policy, we hold that (1) Spruill was not required to seek money damages in his grievances, and therefore has not procedurally defaulted his claim for money damages; (2) Spruill was required to name Brown in his grievances, but that the officials handling Spruill's grievances waived his default on this requirement; and (3) Spruill exhausted the administrative remedies under the Grievance System Policy.

Finally, turning to the merits-based arguments that the defendants advance as alternate grounds for affirmance of the District Court, we conclude that Spruill

2

does not state a claim for deliberate indifference against Gooler, but that his allegations against Dr. McGlaughlin and Brown are sufficient to withstand a motion to dismiss. We will therefore affirm in part, reverse in part, and remand for further proceedings against Dr. McGlaughlin and Brown.

## I. Facts and Procedural History

As this case comes to us on the District Court's grant of a motion to dismiss, we must accept as true the facts as pled in Spruill's complaint. *E.g.*, *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 168 (3d Cir. 2002). Given that the exhaustion issue turns on the indisputably authentic documents related to Spruill's grievances, we hold that we may also consider these without converting it to a motion for summary judgment.[2] *See Steele v. Fed.*

---

[2] Strictly speaking, the motion acted on by the District Court should not have been captioned as a Fed. R. Civ. P. 12(b)(6) motion to dismiss, but rather as a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings, because we have held that failure to exhaust administrative remedies under § 1997e(a) is an affirmative defense. *See Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002). There is no material difference in the applicable legal standards, so for the sake of familiarity, we shall use the "motion to dismiss" formulation of Fed. R. Civ. P. 12(b).

*Bureau of Prisons*, 355 F.3d 1204, 1212 (10th Cir. 2003) (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (noting that "a defendant may submit an indisputably authentic [document] to the court to be considered on a motion to dismiss")). We now chronicle the facts as set forth in Spruill's complaint.

### A. Spruill's Complaint

Spruill is currently incarcerated at the State Correctional Institution at Chester, Pennsylvania ("SCI-Chester"), but he has been housed in at least two other facilities. His complaint alleges that, shortly after he was transferred to the State Correctional Institution at Coal Township, Pennsylvania ("SCI-Coal") in May 2001, the defendants were deliberately indifferent to his medical needs and subjected him to unnecessarily painful medical treatment. Named as defendants in the complaint are Frank Gillis, the Superintendent at SCI-Coal; Lieutenant Steven Gooler, the Unit Manager of the Restricted Housing Unit (RHU) at SCI-Coal, where Spruill was housed during the events at issue; Dr. Shawn McGlaughlin, a prison physician; and Brian Brown, a physician's assistant.

On May 2, 2001, Spruill was transferred from the State Correctional Institution at Rockview (SCI-Rockview), Pennsylvania to SCI-Coal, where he was housed in the RHU. Upon his arrival, Spruill immediately requested to see a medical staff member about severe pain he was experiencing in his lower back area and his right leg. "Several hours later," he

was interviewed by a nurse. After Spruill described his pain, and stated that he "suffers from a chronic and debilitating lower back disorder, spondylotic spinal stenosis with recurrent compression of L3 and/or L4 nerve root on right," the nurse said, "There is nothing I can do, you will need to sign up for sick call."

Spruill signed up for sick call on May 3, but the next morning, he fell due to a severe pain in his leg and back, striking the left side of his face on the metal toilet in his cell. Spruill believes he was knocked unconscious and also injured his right thumb. That same day, May 4, he informed the nurse of his fall, his additional injuries, and continuous back pain; the nurse said that she would inform the doctor. Spruill also informed Gooler about his fall, to which Gooler responded, "so, what do you want me to do?" Spruill filed an official inmate grievance on May 4 complaining about the fall and new injury. Gooler did not notify health care providers once he was informed of Spruill's injuries; at that point, Spruill had yet to be examined by a medical doctor.[3]

---

[3]The grievance filed by Spruill dated May 4, 2001, reads as follows:

> On the above stated date at approx. 5:35 a.m., this writer attempted to get up out of the bed. I took perhaps approximately 3 to 4 short steps, wherein, at that juncture, this writer received and/or experienced an extremely sharp pain in the lower back & as well as severe pain up and down the front and back sides of the right leg. It was at that point this writer fell to the floor in a forceful manner, hitting the left side of my face on the edge of the "metal" toilet in the cell. This writer did as well also jammed and/or injured his right thumb in the same fall. This writer has reason to believe that he may have passed out due to the forceful blow he received to the left side of his face when he fell. This writer has made repeated request, prior, to see the doctor, only to be told that the doctor does not visit the RHU. To date, and even in light of this writer's sick call request and most recent fall incident, this writer has yet to be examined by this institution's doctor and/or RHU security staff. This writer also informed RHU Lt. Goolier, about the aforementioned fall. His reply was: so, what do you want me to do. The writer finds Lt. Goolier said remarks to be highly unprofessional. He is required to notify medical respecting this writer's fall and blow to the head. What must I do, die, before I can get medical attention?

In response to the prompt on the grievance form to "[l]ist actions taken and staff you have contacted, before submitting this grievance," Spruill wrote:

On May 5, Dr. McGlaughlin came to Spruill's cell regarding the sick call request. Dr. McGlaughlin refused to examine Spruill and stated that Spruill would never go to the infirmary. Spruill filed a second grievance on May 6 complaining that McGlaughlin had failed to conduct a physical examination of him.[4]

Spruill was seen by the physician's assistant, Brown, on May 7. At that encounter, Brown accused Spruill of faking his injuries and did not examine him. On May 9, Spruill complained to the nurse that the pain medication he was prescribed for his back[5] "wasn't working," and later that morning Spruill experienced another "extremely sharp pain" in his

---

> Submitted sick call request(s) about back pain, spoke to the nurse(s) about my back pain and seeing the doctor—they said that it was nothing they could do, and that the doctor will not come to the RHU to see me. I spoke to Lt. Goolier about my situation, he demonstrated no "care" or concern regarding my health and/or well being.

[4]The grievance filed by Spruill dated May 6, 2001, reads as follows:

> This writer avers the following: I was seen on 5-5-2001, by a member of the medical staff whom identified himself as the institutional medical "doctor." I explained to the doctor that I suffer from a "chronic back disorder" and currently experience severe pain around my lower back & right leg. And that I had fallen in the cell the day prior, "hitting my face on the metal toilet & also hurting my right hand in said fall. Moreover, I advised the doctor that my fall was directly related to my not being able to walk—due to

---

> the continued severe pain I am having. More pointedly, the aforementioned doctor never once conducted a physical examination in which to determine the full extent of my pre-existing back condition or the injuries I sustained relative to my fall on 5-4-2001. In addition, said doctor's visit to the RHU with me lasted approximately 30 seconds maybe less. To date, I am still experiencing a considerable amount of pain.

In response to the prompt on the grievance form to "[l]ist actions taken and staff you have contacted, before submitting this grievance," Spruill wrote:

> Spoke to nurses and RHU staff members who stated there's nothing they can do. I will need to submit a grievance.

[5]It is not clear from Spruill's complaint whether this medication was prescribed by an SCI-Coal physician, or by a physician from SCI-Rockview, from which Spruill had just been transferred.

5

lower back and leg which caused him to fall again. Spruill submitted another sick call request, and was seen on May 10 by Brown in response to that request. Spruill told Brown that "the current medication was not working to reduce his pain," but Brown did not take any actions to help him. Spruill submitted another sick call request on May 11, following which he was seen by Dr. McGlaughlin on May 12. Dr. McGlaughlin stated that he did not believe there was anything wrong with Spruill's back, and accused Spruill of "playing games." Spruill filed a third grievance that day.[6]

On May 14, Dr. McGlaughlin had Spruill brought into the medical examination room, where Dr. McGlaughlin deliberately bent and twisted Spruill's legs "as if he was trying to shape a pretzel." Dr. McGlaughlin did not examine Spruill's face or thumb for injuries sustained on the morning of May 4.

The grievances were consolidated and denied upon Initial Review, and Spruill filed administrative appeals. The first appeal was denied, and Spruill filed a final appeal, which was also denied. The stated

---

[6]The grievance filed by Spruill dated May 12, 2001, reads as follows:

> This writer avers that at approximately 8:34 a.m. on the above indicated date, SCI-Coal Chief Medical Director Dr. McGlaughlin, came to my cell regarding my sick call request. Dr. McGlaughlin stated to me: that I had been evaluated back in "February 2001," by Dr. Osgood, who has said that I am pain-free, and that there's nothing wrong with my back.

> In addition: Coal's Chief Medical Director stated to this writer that this: "brings an end to your little back playing games." This writer contends that Dr. McGlaughlin's remarks as stated herein above were highly unprofessional in this

> particular instance, since he has never conducted any physical examination on this writer.

> To date, this writer remains in constant sever[e] pain. And Dr. McGlaughlin's continued course of treatment that he knows is painful & ineffective may soon entail a substantial risk of me seriously harming myself in this cell "falling."

> In response to the prompt on the grievance form to "[l]ist actions taken and staff you have contacted, before submitting this grievance," Spruill wrote:

> Spoke to officer Shay—"Pod officer" who indicated that it is very little if anything at all he could do, the matter will need to be addressed by medical or by way of the grievance system.

6

reasons behind the denials were that Spruill was, at the time, receiving appropriate medical care. As our rescription of the grievances demonstrates, *see supra* notes 3, 4 & 6, Spruill did not seek monetary relief from the prison, nor do the grievances identify Brown by name or by description.

### B. Proceedings in the District Court

Spruill filed the present suit seeking monetary and injunctive relief. Because Spruill had by then been transferred to SCI-Chester, the District Court held that his claim for injunctive relief against officials at SCI-Coal was moot under *Abdul-Akbar v. Watson*, 4 F.3d 195, 206-07 (3d Cir. 1993). The District Court granted all four defendants' motions to dismiss on several grounds, holding, *inter alia*, that (1) Spruill's failure to seek money damages in his grievances constituted a failure to exhaust administrative remedies; (2) because Spruill received adequate medical treatment, he had stated no claim for a violation of his Eighth Amendment rights; and (3) Spruill had failed to exhaust his claim against Brown because the grievances did not name Brown.

### C. This Appeal

Spruill appeals the dismissals of Lt. Gooler, Dr. McGlaughlin, and Brown, but does not appeal the dismissal of Superintendent Gillis. The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343, as a suit arising under a federal law securing civil rights, 42 U.S.C. § 1983. Spruill filed a

timely notice of appeal from the final order dismissing the action and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's decision to grant a motion to dismiss. *Broselow v. Fisher*, 319 F.3d 605, 607 (3d Cir. 2003). To the extent that our review turns on the statutory construction of the exhaustion requirement in § 1997e(a), our review is also plenary. *Concepcion v. Morton*, 306 F.3d 1347, 1352 (3d Cir. 2002) (holding that "the scope of § 1997e(a)'s applicability, which is a question of law" is subject to plenary review); *see also Nyhuis v. Reno*, 204 F.3d 65, 66 (3d Cir. 2000).

The defendants advance several grounds on which to affirm the judgment of the District Court. First, they argue that Spruill's failure to seek money damages in his grievances precludes him from now seeking damages in federal court. Second, Brown argues that Spruill's failure to name him in the grievances is a failure to exhaust. Third, all defendants argue that Spruill has not alleged facts sufficient to establish a violation of his Eighth Amendment rights.[7] We will treat each of these arguments in turn.

### II. Exhaustion Under the PLRA

---

[7]Gooler captions this issue as a qualified immunity defense, which it is not. The substance of his argument is that Spruill's complaint does not establish that Gooler acted with a mental state of deliberate indifference.

## A. The CRIPA

In 1980, Congress enacted the Civil Rights of Institutionalized Persons Act (CRIPA), Pub. L. No. 96-247, 94 Stat. 349 (1980). CRIPA § 7 (originally codified at 42 U.S.C. § 1997e) took several steps to foster the development of administrative grievance systems in prisons: First, it directed the Attorney General to promulgate, after consultation with others, "minimum standards for the development of a plain, speedy, and effective system for the resolution of [inmate] grievances." CRIPA § 7(b)(1). Second, it directed the Attorney General to set up a certification program for inmate grievance systems. CRIPA § 7(c). Third, it gave District Courts discretion to continue (i.e. stay) § 1983 cases brought by prisoners "in order to require exhaustion of such plain, speedy, and effective administrative remedies as are available." CRIPA § 7(a). The Supreme Court "described this provision as a 'limited exhaustion requirement.'" *Porter v. Nussle*, 534 U.S. 516, 523-24 (2002) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 150-51 (1992)); *see also Concepcion*, 306 F.3d at 1352.

## B. The PLRA

This regime of discretionary continuance to exhaust administrative remedies lasted until the 1996 enactment of the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 at 66 (1996). Section 803(d) of the PLRA amended CRIPA § 7 to, *inter alia*, remove the standards-setting and certification roles of the Attorney General, and replace the discretionary continuance provision with a mandatory dismissal provision:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

PLRA § 803(d) (codified at 42 U.S.C. § 1997e(a) and amending CRIPA § 7(a)). As the Supreme Court explained in *Nussle*:

> [This] exhaustion provision differs markedly from its predecessor. Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All "available" remedies must now be exhausted; those remedies need not meet federal standards, nor must they be "plain, speedy, and effective." Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. And unlike the previous provision, which encompassed only § 1983 suits, exhaustion is now required for all "action [s] . . . brought with respect to prison conditions," whether under § 1983 or "any other Federal law."

534 U.S. at 524 (citing *Booth v. Churner*,

532 U.S. 731, 739-41 & n.5).

Several courts have recounted the legislative history of the PLRA, and we need not do so once again. *See, e.g.*, *Johnson v. Daley*, 339 F.3d 582, 598-99 (7th Cir. 2003) (Ripple, J., concurring in the judgment); *Nussle v. Willette*, 224 F.3d 95, 106 (2d Cir. 2000), *rev'd sub nom. Porter v. Nussle*, 534 U.S. 516 (2002); *Alexander v. Hawk*, 159 F.3d 1321, 1324-25 (11th Cir. 1998). The Supreme Court summarized the objectives of the exhaustion requirement of the PLRA in *Nussle*:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might "filter out some frivolous claims." And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

534 U.S. at 524-25 (quoting and citing *Booth*, 532 U.S. at 737). With this background to guide us, we turn next to interpreting § 1997e(a)'s exhaustion requirement.

C.  Exhaustion and Procedural Default

We have previously addressed the applicability of § 1997e(a) to actions by prisoners who have filed suit in federal court before pursuing all avenues of relief available to them within their prison's inmate grievance system. In *Nyhuis*, 204 F.3d 65, we held that an inmate seeking relief that the prison's administrative grievance system cannot provide (in *Nyhuis*, it was money damages) must nonetheless pursue the grievance process to its end before coming to federal court. We concluded that the PLRA "make[s] exhaustion of *all* administrative remedies mandatory." *Id.* at 67 (emphasis added). The question we now consider is whether "all administrative remedies" are exhausted whenever there is no further process available to the inmate within the grievance system (which would happen if, say, an inmate fails to file an administrative appeal), or whether it is necessary that the inmate reach this endpoint having availed himself of every process at every turn (which would require all appeals to be timely pursued, etc.). Put another way, we ask whether the PLRA requires simple exhaustion or something more—"proper" exhaustion, as it were. To borrow terms from other areas of the law that recognize an exhaustion requirement, we consider whether the PLRA's exhaustion requirement is merely a termination requirement, or also includes a procedural default component.

9

We recognize that there is an emerging split among the circuits on whether the PLRA includes a procedural default component. *Compare Ross v. County of Bernalillo*, 365 F.3d 1181,1186 (10th Cir. 2004) ("[T]he PLRA, like 28 U.S.C. § 2254, contains a procedural default concept within its exhaustion requirement."), *and Pozo v. McCaughtry*, 286 F.3d 1022 (7th Cir.) (same), *cert. denied* 537 U.S. 949 (2002), *with Thomas v. Woolum*, 337 F.3d 720, 723 (6th Cir. 2003) ("[W]e hold that so long as an inmate presents his or her grievance to prison officials and appeals through the available procedures, the inmate has exhausted his or her administrative remedies, and a prison's decision not to address the grievance because it was untimely under prison rules shall not bar the federal suit.").

1. The Procedural Default Component of the PLRA

The Supreme Court has observed in the federal habeas corpus context that an exhaustion requirement without a procedural default component is quite toothless. To "protect the integrity of the federal exhaustion rule, [federal habeas courts] ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (quotation marks and citations omitted) (emphasis in original).

[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer "available" to him. In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court.

*Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (citing 28 U.S.C. § 2254(b); *Engle v. Isaac*, 456 U.S. 107, 125-26, n.28 (1982)).

The value of a procedural default rule for enforcing an exhaustion requirement is obvious. For example, both state criminal processes and prison administrative grievance systems normally include time bars; without the backstop of a procedural default rule, an aggrieved prisoner could evade § 1997e(a)'s exhaustion requirement by simply letting the time to present his grievance expire, and a habeas petitioner could likewise evade 28 U.S.C. § 2254(b)'s exhaustion requirement by not timely appealing within the state court system. There are many other points at which an aggrieved prisoner or a habeas petitioner could similarly deprive the prison grievance system or state court

10

system, respectively, of the opportunity to fairly consider his claim.

The analogy is far from perfect, though. For one thing, the Supreme Court has consistently located the procedural default component of federal habeas law in the "independent and adequate state ground" doctrine, *see, e.g.*, *Lee v. Kemna*, 534 U.S. 362, 375 (2002); *Coleman*, 501 U.S. at 729, a doctrine that, in the habeas context at least, "is grounded in concerns of comity and federalism," *id.* at 730; *see also Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997). It is at least possible that the comity-and-federalism rationale (and hence the "independent and adequate state ground" rule) applies with greater force to defaults in state *judicial* proceedings than it does to defaults in state *administrative* proceedings. Another problem with uncritically importing principles from federal habeas doctrine into this context is that in other federal statutory schemes—most prominently, employment discrimination claims under the Age Discrimination in Employment Act (ADEA)—the Supreme Court has *not* interpreted an exhaustion-like requirement to imply a procedural default component.[8]

---

[8]Section 14(b) of the ADEA, 29 U.S.C. § 633(b), provides that, in states that have a "State authority" authorized to enforce state laws against age discrimination (known as "deferral states"), an ADEA private plaintiff may not bring a federal lawsuit "before the expiration of sixty days after proceedings

have been commenced [before the State authority]." In *Oscar Mayer & Co. v. Evans*, 441 U.S. 750 (1979), the Supreme Court concluded that this provision (which is parallel to § 706(c) of Title VII, *see Oscar Mayer*, 441 U.S. at 755-56) makes "resort to administrative remedies in deferral States by individual claimants . . . mandatory, not optional." *Id.* at 758. In substance, then, section 14(b) implies a sort of exhaustion requirement, because aggrieved parties in deferral states must at least commence the available state administrative proceedings. The *Oscar Mayer* Court went on, however, to also hold that section 14(b) does not authorize the denial of federal relief in the face of a state procedural default. 441 U.S. at 758-65. Thus, section 14(b) does not bar a suit by an ADEA plaintiff in a deferral state who does not avail himself of the available state administrative process, or only seeks to invoke that process after a state time limit for doing so has expired. In short, the Court explained, "state procedural defaults cannot foreclose federal relief." *Id.* at 762. Thus, the ADEA has an exhaustion requirement but no procedural default component.

But like the federal habeas corpus analogy, the *Oscar Mayer* analogy is imperfect. *Oscar Mayer* emphasizes that relief before a state agency is based on *state* law, and "independent [of] federal relief." 441 U.S. at 761. Thus, ADEA relief operates substantively in parallel with state relief, even though section

The competing analogies of federal habeas corpus and federal civil rights law are developed in greater detail in the majority and dissenting opinions in the Court of Appeals for the Sixth Circuit's opinion on the same exhaustion question we consider here. *See Thomas*, 337 F.3d 720 (Moore, J.); *id.* at 737 (Rosen, J., dissenting in part and concurring in the judgment). Suffice it to say that we find neither position entirely satisfactory. But the foregoing discussion at least suggests that an exhaustion rule can (though need not) be fairly read to include a procedural default component. Therefore, the best course, we think, is to examine Congress's policy objectives in enacting § 1997e(a), and to evaluate whether those are better served by a procedural default rule, or the absence of one.

We believe that Congress's policy

---

14(b) encourages that, procedurally, they be pursued consecutively. In contrast, § 1997e(a) is addressed only to "[§ 1983 and] any other Federal law." While relief is to be pursued consecutively under § 1997e(a) (first in the prison grievance system, and then in federal court), the substantive rights are *exclusively federal* in character. If the PLRA charged state prison authorities with remedying only state law, we might find the parallel to the ADEA more persuasive; but in the PLRA regime state prison authorities are called upon to remedy violations of *federal* law.

objectives will be served by interpreting § 1997e(a)'s exhaustion requirement to include a procedural default component. Based on our earlier discussion of the PLRA's legislative history, *see supra* Part III.B, Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits. Each of these goals is better served by interpreting § 1997e(a)'s exhaustion language to include a procedural default component than by interpreting it merely to require termination of all administrative grievance proceedings.

All three goals are obviously served by a procedural default rule because such a rule prevents an end-run around the exhaustion requirement, and thereby creates an overwhelming incentive for a prisoner to pursue his claims to the fullest within the administrative grievance system. There are subtler benefits too: A procedural default rule enhances the integrity of prison administration because it ensures prisoner compliance with the specific requirements of the grievance system. A procedural default rule ensures that an administrative record will be developed in the best fashion (i.e., under a grievance system designed to create just such a record), and that the possibility of settlement will be explored within a

framework where prison administrators will be receptive to settlement. Finally, Congress wanted to erect any barrier it could to suits by prisoners in federal court, and a procedural default rule surely reduces caseloads (even though it may be a blunt instrument for doing so).

## 2. Measuring Procedural Default

Having concluded that, as a matter of statutory construction, § 1997e(a) includes a procedural default component, we must identify the source of the rules that a prisoner must follow to avoid procedurally defaulting his claim. Judge Easterbrook has aptly referred to this question as "the choice of law issue." *Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002). He elaborates:

> Very few courts have addressed what things an administrative grievance must contain, and none has attended to the choice-of-law issue. Courts—and presumably litigants too—have assumed that the general objectives that inspired § 1997e(a) also determine how a prisoner must go about exhausting state remedies. The sixth circuit, for example, demands that the administrative grievance name each person who ultimately becomes a defendant. *Curry v. Scott*, 249 F.3d 493, 504-05 (6th Cir. 2001). In contrast, the eleventh circuit requires only that a prisoner include in a grievance all the information the prisoner reasonably can be expected to know; failing to

> identify a specific person does not prevent a later suit against that person. *Brown v. Sikes*, 212 F.3d 1205, 1208 (11th Cir. 2000). Presumably the sixth circuit likewise would require legal claims to be identified, while the eleventh would not. Yet both of these decisions skip over a vital question: what body of law governs the specificity inquiry?

*Id.*

We agree that this is a critical question: Is procedural default under § 1997e(a) governed by express federal law, federal common law, or by the "law" of the state prison grievance system (as stated in this case in the Grievance System Policy)? By "federal common law" we refer to some putative set of rules, or at least general standards, for assessing whether a grievance was timely, included a sufficiently detailed factual account, requested appropriate relief, etc. At all events, we agree with Judge Easterbrook's conclusion that prison grievance procedures supply the yardstick for measuring procedural default. *Accord Pozo*, 286 F.3d at 1025. This result is more in harmony with Congressional policy than creating *ad hoc* federal common law, and it is also fairer to inmates.

To begin with, there simply is no express federal law describing the procedural requirements with which prisoners must comply in satisfying § 1997e(a)'s exhaustion requirement. *See*

*Strong*, 297 F.3d at 649. As between crafting judge-made law on this subject and looking to state prison grievance procedures, the latter will far better serve the policy interests of the PLRA. We have repeatedly noted above that the legislative history is clear that the PLRA was intended to return control of prisons to wardens; one aspect of this was a comprehensive program of returning control of the grievance process. Mandatory exhaustion (with a procedural default component) ensures that inmate grievances will be addressed first within the prison's own system—in this respect, the PLRA is thus appropriately defederalizing. Moreover, Congress repealed the portions of CRIPA that established federal standards-setting and certification for prison grievance systems. It would be anomalous, to say the least, to refuse to give effect to the very rules that the PLRA encourages state prison authorities to enact.[9] Indeed, the unintended result of making federal common law on this subject might even be that prisons would acquiesce in that federal common law by incorporating it

into their grievance systems.

We also believe that, from a notice and due process point of view, it is fairer to hold inmates to a single, consistent set of procedural rules in pursuing their grievances. If we were to create our own common law on the subject, we would in effect be asking prisoners to both comply with prison grievance procedures (to ensure that the prison will hear their grievances), while keeping an eye on a separate set of federal requirements (to ensure that they will preserve a remedy in federal court if it comes to it). The better approach is to have federal courts recognize prisoners' procedural defaults within the applicable prison grievance system.[10]

---

[9]Simply because the rules are procedural does not somehow lessen the importance to the prison authority of having federal courts honor them. *Cf. Coleman*, 501 U.S. at 730 (explaining that when a federal habeas court ignores a state procedural ground for rejecting a federal claim, "the habeas court ignores the State's legitimate reasons for holding the prisoner").

---

[10]To be sure, we have previously suggested that in enacting the PLRA, "Congress intended to save courts from spending countless hours, educating themselves in every case, as to the vagaries of prison administrative processes, state or federal." *Nyhuis*, 204 F.3d at 74. This arose, however, in a discussion of the reasons that § 1997e(a) does not include a futility exception (which would require federal courts to make predictive inquiries about what grievances might or might not be futile). We are comfortable that evaluating a procedural default in the course of an existing and fully developed grievance will be an order of magnitude less complex and less fact-intensive than ascertaining whether a prisoner's undeveloped grievance would be futile.

Finally, we note that just as procedural default in the federal habeas corpus context must be predicated on an *adequate* (and independent) state ground, *see Ford v. Georgia*, 498 U.S. 411, 423-24 (1991), so too must a prison grievance system's procedural requirements not be imposed in a way that offends the Federal Constitution or the federal policy embodied in § 1997e(a). We made the same observation (albeit in somewhat different terms) in *Nyhuis*, 204 F.3d at 77-78, where we explained that the policy of § 1997e(a) is that "compliance with the administrative remedy scheme will be satisfactory if it is substantial." As the next Part makes clear, though, we have no occasion in this case to further elaborate on this aspect of §1997e(a).

## D. Exhaustion of Spruill's Claims

The first "exhaustion" question is whether Spruill has exhausted his administrative remedies in the literal sense—whether further avenues of relief are available to him within the prison's inmate grievance process. None are. DC-ADM-804 Part VI provides for three stages of review within Pennsylvania's Grievance System: Initial Review (DC-ADM-804 Part VI.B), which addresses the inmate's filed grievance; the first appeal from the Initial Review, known as Appeal to Facility Manager (DC-ADM-804 Part VI.C); and a second and final appeal, the Appeal to Secretary's Office of Inmate Grievances and Appeals (DC-ADM-804 Part VI.D). Spruill's grievances went through all stages and were denied. He has no further administrative process

available.

We turn, then, to the procedural default component. Unlike federal habeas corpus procedural default inquiries under 28 U.S.C. § 2254(b) and *Coleman*, where the federal court typically will have the benefit of a state-court ruling on whether a petitioner has procedurally defaulted his federal claim under state procedural law, a court reviewing a prisoner's § 1983 claim for compliance with § 1997e(a) will have, at best, a ruling from a prison grievance appellate body on whether the prisoner complied with the prison grievance system's procedural rules.[11] At worst, the state administrative body will not have passed at all on the prisoner's procedural compliance *vel non*, and the federal court must undertake an independent procedural default inquiry. This is what we must do here, for no ruling from the prison administrators addresses the procedural implications of Spruill's failure to specifically ask for money damages or his failure to name Brown in his grievances.

Because this exercise is essentially a matter of statutory construction—it turns

---

[11]Aside from our comments above about the need for administrative grievance systems to comport with the Federal Constitution and the federal policy of § 1997e(a) to be given effect, we express no view as to whether, or under what standard, any such state administrative determinations of procedural default would be reviewable by a federal court.

on the interpretation of the Grievance System Policy—it is a question of law over which we have plenary review. *See Stokes v. Dist. Attorney*, 247 F.3d 539, 540-41 (3d Cir. 2001). It is therefore appropriate for this Court to undertake the inquiry in the first instance. *See Hudson United Bank v. LiTenda Mortgage Corp.*, 142 F.3d 151, 159 (3d Cir. 1998) ("When a district court has failed to reach a question below that becomes critical when reviewed on appeal, an appellate court may sometimes resolve the issue on appeal rather than remand to the district court. This procedure is generally appropriate when the factual record is developed and the issues provide purely legal questions, upon which an appellate court exercises plenary review." (citations omitted)).

### 1. Spruill's Failure to Ask for Money Damages

We have reproduced in full the texts of Spruill's three grievances. *See supra* notes 3, 4 & 6. None requests money damages—or any other specific relief for that matter. As noted above, the defendants assert that Spruill cannot now in federal court seek money damages. As we concluded in the discussion above, we must look to the rules governing the prison's grievance system to ascertain whether Spruill has procedurally defaulted his claim for monetary relief. The portion of the Grievance System Policy that details what "shall," "should," and "may" be included in a grievance reads:

> The inmate shall include a statement of the facts relevant to

the claim. **The text of the grievance shall be legible, presented in a courteous manner, and the statement of facts shall not exceed two (2) pages.** The inmate should identify any persons who may have information that could be helpful in resolving the grievance. The inmate should also include information on attempts to resolve the matter informally. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law. The inmate may include a request for compensation or other legal relief normally available from a court.

DC-ADM 804, Part VI.A.1.d (emphasis in original).

The verbs in this paragraph establish three tiers of grievance components: items that are mandatory ("shall"); items that are required to the extent practicable ("should"); and items that are optional ("may"). A request for money damages falls in the third category. Since an optional procedural provision cannot give rise to a procedural default, it appears that Spruill is not now precluded from seeking money damages.

There is, however, a possible alternative reading: The sentence at issue may be addressed not to the written contents of a grievance, but rather to the scope of relief available within the grievance system. This is not an

unreasonable matter for a prison grievance system policy to address; indeed, it was the *absence* of a mechanism to recover monetary relief—in a prior version of the very grievance system here at issue—that generated the controversy in *Booth*, 532 U.S. 731 (holding that the unavailability of monetary relief through a prison grievance system does not excuse a prisoner seeking only money damages from the PLRA's exhaustion requirement). *See also id.* at 734 & n.1 (noting that Pennsylvania's grievance system did not provide for recovery of money damages at the time of Booth's grievance, but that it had since been modified to permit such recovery). Interpreting the provision above as establishing the scope of available relief—and implicitly requiring that the prisoner identify the relief he seeks—would lead to the conclusion that Spruill did procedurally default his claim for monetary relief.

We reject this scope-of-available-relief reading for several reasons. First, grammatically the regulation reads "may include a request for" and not "may request." Second, the sentence appears as part of a regulation directing the contents of the written grievance, not one that otherwise sets the scope of permissible relief. Third, the form itself on which grievances are filed does not include any prompt for stating the relief sought. Furthermore, the regulation does not read like a regulation that could give rise to a procedural default for failure to plead properly for relief. The regulation quoted above is far cry from, say, a regulation that

reads, "If the inmate desires compensation or other legal relief normally available from a court, the inmate shall request the relief with specificity in his/her initial grievance."

In sum, Spruill cannot be said to have failed to follow the regulations—and thus procedurally defaulted—in this respect. Nothing in the Grievance System Policy would have put Spruill on notice that he had to ask for money damages—or any particular form of relief at all. Therefore we conclude that he has satisfied § 1997e(a), and we cannot affirm the District Court's dismissal on this failure-to-exhaust ground.

2. Spruill's Failure to Name Brown in His Grievances

The passage quoted above regarding the contents of the grievance is also the only section of the Grievance System Policy requiring that the grievance identify specific persons. On this matter, the text is mandatory, or nearly so: "The inmate shall include a statement of the facts relevant to the claim. . . . The inmate should identify any persons who may have information that could be helpful in resolving the grievance. The inmate should also include information on attempts to resolve the matter informally." DC-ADM 804, Part VI.A.1.d. To the extent that Brown's identity is a "fact[] relevant to the claim"—and it is—it was mandatory for Spruill to include it. To the extent that Brown was a "person[] who may have information" or someone with whom Spruill made "attempts to resolve the

17

matter informally"—and he was—Spruill was required to identify Brown if practicable. Spruill did not, and has offered no explanation for his failure to do so. Any grievance against Brown would now be time-barred. *See* DC-ADM 804, Part VI.A.1.e ("Grievances must be submitted by the inmate . . . within fifteen (15) working days after the events on which the claims are based."). Thus Spruill has procedurally defaulted a claim against Brown by failing to identify him.

But the prison's grievance process excused this procedural default: The grievance officer's "Initial Review Response" (the first-level determination under the Grievance System Policy) identified Brown by name. Although the response identified Brown only as someone who had seen Spruill in the course of his medical visits, it is not to be expected that a response rejecting Spruill's grievances on the merits would identify any malfeasance on Brown's part. The purpose of the regulation here is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing. As such, the prison can excuse an inmate's failure to do so by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance.

The point is close, but we conclude that the prison grievance officer's recognition that Brown was involved in the events that Spruill complained of excused any procedural defects in Spruill's initial grievances. Spruill's grievances and suit are not about specific instances of insulting treatment by Brown—there would be no constitutional violation there anyway. Rather, the grievances and the suit are about a larger-scale denial of adequate medical care, in which prison officials clearly knew Brown was alleged to be implicated. Thus we reject the District Court's dismissal of Spruill's suit against Brown on these grounds.

* * *

In closing this Part, we stress that under § 1997e(a), the warden is responsible for the grievance system. If the warden (or whoever the appropriate state official may be) is dissatisfied with the procedural default rulings in this Part, he or she may alter the grievance system to require more (or less) of inmates by way of exhaustion. Such measures, we reiterate, must be consistent with the Federal Constitution and the federal policy embodied in § 1997e(a) to be enforced as grounds for procedural default in a subsequent federal lawsuit. As we observed in *Nyhuis*, 204 F.3d at 77, "if in the long run, something of a cooperative ethos can be achieved between inmate and jailer, the internal administrative process could prove a less hostile and adversarial forum than that of federal court." We are likewise hopeful that our holdings today on procedural default and waiver will not engender a prison grievance review culture marked by technicalities, but will instead foster the cooperative resolution of legitimate grievances by further encouraging prisoners to avail themselves of the forum usually best suited to redress those grievances.

18

### III. Spruill's Eighth Amendment Claims

Because there is no exhaustion or procedural default bar to Spruill's suit, we turn to the merits of his Constitutional claims. We have on several occasions discussed the conditions under which deprivation of medical treatment violates a prisoner's Eighth Amendment right not to be subjected to cruel and unusual punishment. "Only 'unnecessary and wanton infliction of pain' or 'deliberate indifference to the serious medical needs' of prisoners are sufficiently egregious to rise to the level of a constitutional violation." *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153 (1976))). Allegations of medical malpractice are not sufficient to establish a Constitutional violation. *See id.* (citing *Estelle*, 429 U.S. at 106); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (*MCCII*) (citing *Estelle*, 429 U.S. at 106 & n.14; *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (holding that negligence is not compensable as a Constitutional deprivation). "[M]ere disagreement as to the proper medical treatment" is also insufficient. *MCCII*, 834 F.2d at 346 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977); *Massey v. Hutto*, 545 F.2d 45, 46 (8th Cir. 1976) (per curiam)).

As we explained in *White*, the *Estelle* "deliberate indifference to serious medical needs" standard is clearly met when a doctor is "intentionally inflicting pain on [a] prisoner[]." 897 F.2d at 109. In *MCCII*, we identified several other scenarios that satisfy *Estelle*. Most relevant to this case are (1) "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,'" *MCCII*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)), and (2) "where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,'" *id.* (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985)) (alterations in original).

The *Estelle* standard "'requires deliberate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious.'" *Id.* (quoting *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978)). Spruill's complaint satisfies the second prong. First, his back condition itself has allegedly required significant and continuous medication, and has caused him excruciating pain. Second, within the brief period described in his complaint, Spruill claims to have fallen or collapsed from the pain twice (first on May 4, and again on May 9), exposing himself to further injury. The extreme pain and real possibility of permanent injury could qualify Spruill's condition as a serious medical need. Naturally, this will need to be fleshed out with further evidence (e.g., expert medical testimony), but at the motion-to-dismiss stage, the complaint is certainly adequate in this

respect. The closer question is whether Spruill has alleged facts supporting the inference that Gooler, Dr. McGlaughlin, and Brown were deliberately indifferent (or intentionally malicious) with respect to his condition. For reasons that will become apparent, we treat Gooler first, and then Dr. McGlaughlin and Brown together.

### A. Claims Against Gooler

*Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993), resembles the case at bar in that the plaintiff-prisoner (Durmer) sued both medical and non-medical prison officials. With respect to the non-medical prison officials, Barker and Fauver, we explained:

> [W]e believe that summary judgment was proper with respect to defendants Barker and Fauver. The only allegation against either of these two defendants was that they failed to respond to letters Durmer sent to them explaining his predicament. Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.

*Id.* at 69 (footnote omitted). Although *Durmer* was decided at the summary judgment stage, its holding can be readily imported into the motion-to-dismiss stage: If a prisoner is under the care of medical experts (Dr. McGlaughlin and Brown in this case), a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like Gooler will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference. Thus dismissal of Spruill's claims against Gooler *after* the point at which Spruill was first under medical care is appropriate because Spruill bears the burden of proving (and hence pleading) facts supporting the defendants' mental states, *see Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001), and he has failed to so plead with respect to Gooler.[12]

---

[12]We do not find our admonition in *Alston v. Parker*, 363 F.3d 229, 233-34

With respect to Spruill's claims against Gooler in the period *before* he was under medical care—i.e., from his May 2 arrival at SCI-Coal, through his fall and face injury on May 4, to Dr. McGlaughlin's first visit to his cell on May 5—we also conclude that Spruill has not stated a claim against Gooler. First, Spruill did sign up for sick call on May 3, and he was seen by an (unidentified) nurse on May 4; hence he was receiving a minimal measure of medical attention. Second, Spruill does not allege that his condition was so dire and obvious that Gooler's failure to summon immediate medical attention on May 4 (and to instead let the sick call process run its course) amounted to deliberate indifference. The facts as Spruill himself describes them simply do not amount to the *MCCII* examples of "deny[ing] reasonable requests for medical

 

 

 

---

& n.6 (3d Cir. 2004), applicable to this specific point. In *Alston*, we reaffirmed that *pro se* complaints (especially from civil rights plaintiffs) should be read liberally, and noted that prisoners in particular are often at an informational disadvantage that may prevent them from pleading the full factual predicate for their claims. *Id.* Spruill's complaint is lacking not because it fails to allege specific facts to support Gooler's mental state (which, at all events, would be unnecessary under our notice pleading standard, *see id.*), but rather because it does not so much as suggest that Gooler was aware of the alleged inadequacies in Spruill's medical treatment.

treatment . . . expos[ing] the inmate to undue suffering" or "knowledge of the need for medical care" coupled with an "intentional refusal to provide that care." 834 F.2d at 346 (quotation marks and citations omitted). Therefore, Spruill has not stated a claim against Gooler and we will affirm the judgment of the District Court dismissing the suit against Gooler.

## B. Claims Against Dr. McGlaughlin and Brown

Though Spruill's allegations about Dr. McGlaughlin's and Brown's course of treatment (or nontreatment) pale next to the allegations in such cases as *White*, 897 F.2d 103, Spruill's complaint nonetheless sufficiently attributes a mental state of deliberate indifference (or worse) to both Dr. McGlaughlin and Brown. Especially when read in light of *Alston*, 363 F.3d at 233-34 & n.6, several excerpts from Spruill's complaint suffice to make the point: Spruill asserts that due to Dr. McGlaughlin's and Brown's "lack of proper medical care, the plaintiff was subjected to the possible risks of a permanent disability or an fatal or serious injury." We have held that "the threat of tangible residual injury" can establish deliberate indifference. *MCCII*, 834 F.2d at 346 (quoting *Westlake*, 537 F.2d at 860). Spruill further claims that Dr. McGlaughlin and Brown acted "maliciously and sadistically," and that those actions were "intended to inflict pain on the plaintiff without any medical justification." If proven, intentional conduct of this sort plainly makes out an Eighth Amendment violation. And finally,

21

according to Spruill, Brown and Dr. McGlaughlin refused to examine him on multiple occasions and Dr. McGlaughlin instead accused him of "playing games"; when Dr. McGlaughlin ultimately did examine him, he twisted Spruill's legs "as if he was trying to shape a pretzel," and Spruill "repeatedly told Defendant McGlaughlin that the examination was causing additional pain to his back and leg."

In sum, Spruill has connected his factual allegations to the alleged mental states of Dr. McGlaughlin and Brown. That he believes their actions were not only deliberately indifferent, but malicious and sadistic, reinforces the sufficiency of his complaint. Since at this stage we are making no judgment about what actually happened, but only about the sufficiency of the pleadings, we must take Spruill's factual allegations, and the reasonable inferences therefrom, as true. We will therefore reverse the District Court's dismissal of Spruill's suit against Dr. McGlaughlin and Brown.

## IV. Conclusion

The judgment of the District Court with respect to Gooler will be affirmed on the ground that Spruill has failed to state a claim upon which relief can be granted for a violation of his Eighth Amendment rights by Gooler. With respect to Dr. McGlaughlin and Brown, we hold that Spruill has met the exhaustion requirement of § 1997e(a), and that he has stated a claim for violation of his Eighth Amendment rights. We will therefore reverse the judgment of the District Court, and remand for further proceedings, with respect to Dr. McGlaughlin and Brown.

22