**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-1929
_____

STEVEN PATRICK HARDY,
Appellant

v.

ARIF SHAIKH; JULIAN GUTTIEREZ-MOLINA;
THEODOR VOORSTAD;
JOHN DOES 1-10; JANE DOES 1-10;
PENNSYLVANIA DEPARTMENT OF CORRECTIONS

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-18-cv-01707)
Magistrate Judge: Hon. Karoline Mehalchick

_____

Argued: January 14, 2020

Before: JORDAN, GREENAWAY, JR., and KRAUSE,
*Circuit Judges*

(Opinion Filed: May 20, 2020)

Leticia C. Chavez-Freed     [Argued]
Chavez-Freed Law
2600 North 3rd Street, 2nd Floor
Harrisburg, PA 17110

    *Counsel for Appellant*

Michael C. Hamilton
Emily B. Ryan-Fiore
Tiffany R. Temas        **[Argued]**
Weber Gallagher Simpson Stapleton Fires & Newby
Four PPG Place, 5th Floor
Pittsburgh, PA 15222

    *Counsel for Appellees Arif Shaikh, Julian Guttierez-Molina, and Theodor Voorstad*

J. Bart DeLone
Howard G. Hopkirk      **[Argued]**
Josh Shapiro
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

    *Counsel for Pennsylvania Department of Corrections*

———————

**OPINION OF THE COURT**

———————

KRAUSE, *Circuit Judge.*

This case presents the question of whether and under what circumstances a misrepresentation renders a grievance process "unavailable" within the meaning of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). We conclude that the District Court erred in finding that the second step of the grievance process here was available to the plaintiff, Steven Patrick Hardy, even though a prison counselor misled him into believing that after his grievance was rejected he should file a new one rather than appeal the rejection. Because that misrepresentation thwarted Hardy's use of the grievance process, we find that he exhausted his available administrative remedies. Accordingly, we will reverse the District Court's grant of summary judgment and remand for further proceedings.

## I. FACTUAL BACKGROUND[1]

Steven Patrick Hardy entered the Camp Hill State Correctional Institution ("Camp Hill") in July 2017 in urgent

---

[1] "Although the availability of administrative remedies to a prisoner is a question of law . . . it necessarily involves a factual inquiry," *Small v. Camden Cty.*, 728 F.3d 265, 271 (3d Cir. 2013) (internal citations omitted). "[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury" as long as the parties are given "some form of notice" and "an opportunity to respond." *Paladino v. Newsome*, 885 F.3d 203, 210, 211 (3d Cir. 2018). Here, the District Court elected to hold an evidentiary hearing to address the threshold exhaustion question. The parties do not dispute

need of medical care: he had previously had part of his leg amputated due to diabetes and had developed an infected open wound as a result of an ill-fitting prosthesis. Typically, inmates entering Camp Hill were transferred immediately to a prison block, where they were given a copy of a Camp Hill inmate handbook explaining, among other things, the inmate grievance process, where grievance forms could be obtained, and that the grievance process required inmates to appeal rejected grievances. But Hardy's first days at Camp Hill were not typical. Because of his physical ailments, he was brought immediately to the infirmary and remained there for his first week at Camp Hill. And because he was not allowed personal belongings in the infirmary, he was not given the inmate handbook but rather was told it would be waiting for him in his prison block. Relying on this assurance, Hardy signed a form acknowledging receipt of the handbook despite not yet having laid eyes on it.

When Hardy arrived at his block, however, the handbook was not there. And Hardy's ensuing efforts to obtain the

that they were given the proper notice and opportunity to respond.

This background is adopted from the undisputed evidence submitted to the District Court in advance of its hearing, the live testimony credited by the District Court, and the District Court's findings of fact in its opinion. *See Hardy v. Shaikh*, No. 1:18-CV-1707, 2019 WL 1756535 (M.D. Pa. Apr. 19, 2019). As required on review of summary judgment, we draw all reasonable inferences in favor of the nonmoving party. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).

4

handbook or a copy of the Inmate Grievance System Policy manual ("grievance manual")—the official policy document issued to Pennsylvania Department of Corrections staff—were unavailing. When he asked prison staff in his assigned block for a handbook, he was told that he "should have already gotten one" and that obtaining one now was "[his] problem." App. 179. Hardy also tried twice to go to the Camp Hill library, which prison officials stated was "the best place to get [a copy of the grievance manual]." App. 166:1–2. But on both occasions, he was told the library was full.

Consequently, while Hardy was aware that a grievance process existed at Camp Hill, he did not know that at Camp Hill, like other Pennsylvania state prisons, exhausting that grievance process requires inmates to complete three steps. Inmates must first submit a written grievance to the Facility Grievance Coordinator and must then file two levels of appeals: first to the Facility Manager and then to the Secretary's Office of Inmate Grievances and Appeals.

As Hardy's leg wound festered, he complained to medical staff about his deteriorating condition and was advised to file a grievance. That much was sound advice, as it directed Hardy to begin the internal process required to exhaust the prison grievance procedure.

Consistent with the first step of that process, Hardy filed a grievance explaining that a particular medical provider at Camp Hill had refused to give him bandages and antibiotic ointment for his wound. This grievance was rejected on procedural grounds because it was not "legible, understandable, and presented in a courteous manner." App. 74. Hardy then submitted a more courteous grievance

5

concerning the same incident.  Although this grievance received a review on the merits by Camp Hill's nurse supervisor, it too was rejected—this time because the reviewer lacked "any information that there were any issues not addressed during [Hardy's] sick call visit."  App. 77.

Hardy then filed a grievance responsive to this rejection.  Now, instead of discussing only a single incident during which he alleged to have been denied proper medical care, his allegations provided a much fuller picture of how the medical staff's failure to properly treat his leg wound in the months since his arrival at Camp Hill—including declining to follow a doctor's recommendation to transfer him to an offsite medical facility for treatment—had caused his wound to deteriorate.  He also explained how his fear that more of his leg would need to be amputated was causing him mental distress and that his request for mental health treatment had been denied.

Although the grievance process normally required grievances to be filed within fifteen days of any incident and Hardy discussed conduct from months ago, his grievance was not "precluded solely by the fact that [these ongoing issues] started outside" the normal fifteen-day time limit because it described a continual pattern of conduct.  App. 177.  But it was rejected for a different reason:  The grievance process required "different events [to] be presented separately" and Camp Hill's grievance coordinator (the prison staffer responsible for reviewing and processing grievances) apparently read this rule to require separate grievances for mental and physical harms.  App. 80.

Unsure of how next to proceed, Hardy again turned to prison staff for advice, asking his counselor, the prison staffer

6

assigned to provide him support and guidance about the grievance process, how he should respond to the grievance rejections. His counselor told him to "fill out another one and send it in."[2] App. 187. This time, the advice Hardy received from prison staff was not sound, for merely submitting a new grievance would not satisfy the appeal requirement. Instead, Hardy could only have effectuated an appeal using the grievance form by writing the word "appeal" somewhere on his new grievance.

Unaware of this requirement—and doing his best to interpret the rule that "different events . . . be presented separately," App. 80—Hardy submitted eight new grievances, this time subdividing the pattern of conduct he described in his third grievance into separate grievances by date. But these grievances too were rejected, this time largely due to yet another procedural requirement: now that Hardy had separated his allegations by date rather than discussing a continual pattern of conduct, his grievances were rejected as time barred.[3] Several weeks later, Hardy submitted one last grievance and finally received a review on the merits. This grievance too was rejected, with the reviewer finding Hardy's

---

[2] Although the record is unclear as to when exactly this conversation took place, the timing of Hardy's various grievances and rejections suggests he must have received this advice after his third grievance was rejected.

[3] Of these eight grievances, six were rejected as time-barred; one was rejected for discussing both mental and physical harms; and another was rejected for discussing the same incident as Hardy's first two grievances.

request to be transferred to a medical facility "[f]rivolous." App. 99.

In total, between December 27, 2017 and March 30, 2018, Hardy filed no less than twelve grievances seeking medical care for his worsening condition, all of which were rejected on varying grounds. A few months after the last rejection, Hardy's fears came to pass and medical staff found it necessary to amputate more of his leg.

## II. PROCEDURAL BACKGROUND

Based on these events, Hardy filed a complaint bringing claims under 42 U.S.C. § 1983, the Americans with Disabilities Act, and state law against both the Pennsylvania Department of Corrections (DOC) and several Camp Hill medical professionals.[4] Both sets of defendants moved for summary judgment on the ground that Hardy failed to appeal his rejected grievances and his suit was thus barred by the PLRA's exhaustion requirement, which requires inmates to exhaust "available" administrative remedies before challenging prison conditions in federal court, *see* 42 U.S.C. § 1997e(a).[5] Hardy conceded that, by failing to appeal the

---

[4] Pursuant to the 28 U.S.C. § 636(c), the parties consented to proceed before a magistrate judge. We therefore refer to the Magistrate Judge's rulings as those of the District Court going forward.

[5] The medical defendants also moved, in the alternative, to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Pursuant to Federal Rule of Civil

8

rejected grievances, he had not exhausted that step of Camp Hill's grievance process, but argued his suit could still proceed because that step was not available to him. Having determined an evidentiary hearing was necessary to resolve the exhaustion issue, the District Court heard testimony from Hardy, from Camp Hill's grievance coordinator, Tonya Heist, and from an officer with the Secretary's Office of Inmate Grievance and Appeals.

After the hearing, the District Court granted summary judgment for the defendants, holding that because the entire grievance process was available to Hardy, his failure to appeal his rejected grievances rendered his claims unexhausted. In so holding, the District Court properly recognized that, under the Supreme Court's decision in *Ross v. Blake*, a prison grievance process is unavailable—and thus may be deemed exhausted—in three circumstances: (1) when the remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 136 S. Ct. 1850, 1859–60 (2016). But the District Court determined that none of these circumstances described Hardy's experience with the Camp Hill grievance process.

The Court based that determination on a number of factual findings. Although it made no finding as to whether Hardy had

---

Procedure 12(d), the District Court construed the medical defendants' entire motion as one for summary judgment.

9

received a handbook, it found that "Hardy was clearly aware a grievance process existed." *Hardy v. Shaikh*, No. 1:18-CV-1707, 2019 WL 1756535, at *5 (M.D. Pa. Apr. 19, 2019). It also found that Hardy's use of this process was not "thwart[ed] . . . through . . . misrepresentation." *Id.* at *3 (quoting *Rinaldi v. United States*, 904 F.3d 257, 266 (3d Cir. 2018)). While the District Court credited Hardy's testimony that his counselor instructed him to respond to a rejected grievance by "fill[ing] out another one and send[ing] it in," it found that this advice did not misrepresent Hardy's duty to appeal because, as a technical matter, Hardy could have submitted an appeal on the same form as an initial grievance by simply writing the word "appeal" somewhere on his submission. *Hardy*, 2019 WL 1756535, at *5 (quoting App. 187). And because the District Court assumed that only a "clear misrepresentation" by prison staff could thwart an inmate's use of a grievance process, it found that the prison's counselor's advice fell short of this standard and the process reviewed was "available" to Hardy. *Hardy*, 2019 WL 1756535, at *5, *7. This appeal followed.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a), and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over both the grant of summary judgment, *Paladino v. Newsome*, 885 F.3d 203, 207 n.16 (3d Cir. 2018), and the "determination of a failure to exhaust," and we "accept the [District Court's] factual conclusions unless clearly erroneous," *Small v. Camden County*, 728 F.3d 265, 268 (3d Cir. 2013).

## IV. DISCUSSION

The District Court's holding that the grievance process was available to Hardy was premised on its assumption that only a "clear misrepresentation" by prison staff may thwart an inmate's use of a grievance process. We are therefore called on to clarify *Ross*'s third genre of unavailability: when does a "misrepresentation" render a grievance process unavailable?

Below, we first consider whether the misrepresentation must be "clear" or whether a statement that is merely misleading or deceptive may suffice. Second, we consider what showing is required to establish that an inmate's use of the grievance process was thwarted by misrepresentation. Finally, we measure Hardy's showing against that standard to determine if the grievance process here was available to him and, accordingly, whether his suit may proceed.

### A. The Meaning of the "Misrepresentation" Under *Ross*

While the District Court assumed that only a "clear misrepresentation" by prison staff can render remedies unavailable, our precedent says otherwise.

We have long recognized that misleading as well as clearly erroneous statements can render a grievance process unavailable, beginning with our 2002 decision in *Brown v. Croak*, 312 F.3d 109 (3d Cir. 2002). There, we held that an inmate who failed to file a formal grievance had nonetheless sufficiently complied with the PLRA's exhaustion requirement because he had received "misleading" instructions from prison staff: "security officials told [him] to wait for the termination of [an internal] investigation before commencing a formal

11

claim" and then "never informed [him] that the investigation was completed." *Id.* at 112, 113. Because it was technically correct that the inmate *could* have waited until after the resolution of the internal investigation to file a grievance, *see id.* at 111 (noting that the inmate "could have filed a grievance" regardless of the status of the internal investigation), these instructions did not clearly misrepresent the grievance process. Yet we found that Brown was "entitled to rely" on these "misleading" instructions and that by giving the inmate advice "at odds" with the grievance process (to wait until the investigation was concluded) and then omitting crucial information from him (whether the investigation had concluded), the prison staff so misled him that they thwarted his ability to pursue relief through the grievance process, rendering it unavailable. *Id.* at 112.

We most recently reiterated this legal standard in *Rinaldi v. United States*, where we characterized *Brown* as finding an inmate's use of the grievance process thwarted when "he was given misleading filing instructions." 904 F.3d at 267; *see also Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016) (relying on *Brown* to define when a grievance process is unavailable); *Small*, 728 F.3d at 271 (same).

Our sister circuits, too, have uniformly found that instructions that are merely misleading but not necessarily clear misrepresentations can thwart an inmate's use of a grievance process. For example, in *Davis v. Hernandez*, the Fifth Circuit held that administrative remedies were unavailable to an inmate who was told that the prison's grievance process involved only a single step when it in fact involved two, applying the rule that "[g]rievance procedures

12

are unavailable to an inmate if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process." 798 F.3d 290, 291, 295 (5th Cir. 2015) (emphasis omitted). The Eighth Circuit too has explicitly held that misleading instructions by prison staff can thwart an inmate's use of a grievance process, concluding that administrative remedies were not available to an inmate who was "misled" by a prison official's advice to wait to file a formal grievance until the prisoner received a response to his informal complaint, when in fact the inmate was required to file an appeal without awaiting a response. *Townsend v. Murphy*, 898 F.3d 780, 783–84 (8th Cir. 2018). And other circuits are in accord.[6]

Although the Supreme Court has not explicitly defined what qualifies as a "misrepresentation" that "thwart[s] inmates from taking advantage of a grievance process," its reasoning in

[6] *See, e.g.*, *Swisher v. Porter Cty. Sheriff's Dep't*, 769 F.3d 553, 555 (7th Cir. 2014) (Posner, J.) (citing *Brown* for the proposition that "[w]hen jail personnel mislead inmates about how to invoke the procedure the inmates can't be blamed for failing to invoke it"); *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011) (relying on *Brown* to find that remedies are unavailable when "prison officials misle[a]d" a prisoner into thinking that "the remedy does not exist or inaccurately describe the steps he needs to take to pursue it"); *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010) (finding a grievance process unavailable to an inmate "misled" about the steps of that process); *cf. Brownell v. Krom*, 446 F.3d 305, 312 (2d Cir. 2006) (finding remedies unavailable to an inmate who relied on a prison official's misleading advice).

13

*Ross*, 136 S. Ct. at 1860, is consistent with the expansive definition adopted by the Courts of Appeals. The critical test under *Ross* is not whether a misrepresentation is "clear" but whether that misrepresentation amounts to "interference with an inmate's pursuit of relief [that] renders the administrative process unavailable." *Id.* Thus, in explaining that a grievance process is unavailable "when prison administrators thwart inmates . . . through . . . misrepresentation," the Court looked to appellate court cases "address[ing] a variety of instances in which officials *misled . . .* individual inmates so as to prevent their use of otherwise proper procedures" and held that "such interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* (emphasis added). The Court also cited approvingly to the Fifth Circuit's decision in *Davis v. Hernandez* and the Seventh Circuit's decision in *Pavey v. Conley*, quoting language from both about prison staff "misleading" inmates. *Id.* at 1860 n.3 (citing *Davis*, 798 F.3d at 295, and *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir 2011)).

This approach is also consistent with the statutory purposes of the PLRA exhaustion requirement. That requirement was intended to "return control of the inmate grievance process to prison administrators"; to "encourage development of an administrative record, and perhaps settlements, within the inmate grievance process"; and to "reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits." *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004). But those benefits cannot be realized unless the grievance process to be exhausted is actually available to inmates and faithfully followed by the prisons. That is why we require prisons to "reasonably communicate[]" remedies to prisoners, *Small*, 728 F.3d at 271, and—recognizing that just as

14

"prisoners [must] comply with the procedural demands of a system created by their jailors[,]" "[n]o less must prisons comply with the demands of the system they created"—we require "strict compliance by prison officials with their own policies," *Shifflett v. Korszniak*, 934 F.3d 356, 365, 367 (3d Cir. 2019).

That is also why it is imperative that prisons refrain from not only clear misrepresentations, but also misleading statements. If prisoners conclude they cannot trust prison staff to give them reliable advice and instructions about the grievance process, they "will be more likely either to bypass internal procedures entirely and file a complaint in federal court or use a federal lawsuit to prod prison officials into a response, thus taxing the judicial resources that Congress meant to conserve by passing the PLRA." *Robinson*, 831 F.3d at 155. Accurate advice, in contrast, allows for "grievance systems that provide—and that are perceived by prisoners as providing—a meaningful opportunity for prisoners to raise meritorious grievances." *Woodford v. Ngo*, 548 U.S. 81, 102 (2006).

In sum, based on both precedent and the purposes of the PLRA, it was error for the District Court to premise exhaustion on a "clear misrepresentation." Misleading or deceptive instructions from a prison official can also render a grievance process unavailable.

## B. The Showing Required to Establish Thwarting of the Grievance Process

Having established that a misleading instruction may qualify as a "misrepresentation" under *Ross*, we now consider

15

what an inmate must show to establish that the misrepresentation "thwart[ed] [him] from taking advantage of a grievance process." 136 S. Ct. at 1860.

As we explained in *Rinaldi*, the burden to plead and prove that he was thwarted rests on the inmate: "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." 904 F.3d at 268 (citation omitted). But while the burden of proof may be clear, the showing required to meet it is not. To date, no Court of Appeals has articulated a clear test for when an inmate has established that a grievance process is unavailable to him because a misrepresentation thwarted his use of that process.

Here again, however, *Rinaldi* paves our way. In that case, we fashioned a test to establish when another type of prison conduct identified in *Ross*—"intimidation"—so thwarted an inmate's use of the grievance process as to render it "unavailable." *Rinaldi*, 904 F.3d at 268–69. The inquiry, we explained, must include an objective and subjective component. *Id.* We described "[t]he objective component [as] of chief importance because it maintains the exhaustion requirement for the vast majority of claims and allows otherwise unexhausted claims to proceed only in the exceptional circumstance where the facts alleged would reasonably give rise to a substantial fear of serious harm." *Id.* at 268. The subjective requirement, on the other hand, ensures that an inmate seeking to be relieved of the exhaustion requirement actually has been thwarted from using the grievance process. *Id.* at 269. Thus, we concluded, an inmate must show both "that the threat was sufficiently serious that it

would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance" and "that the threat actually did deter this particular inmate." *Id*.

These same considerations lead us to adopt an analogous two-part test for when an inmate's use of a grievance process is thwarted by misrepresentation. As an objective matter, taking account of the speaker and context, the instruction must be of the sort that a reasonable inmate would be "entitled to rely on," even though it is "at odds with the wording" of the grievance process. *Brown*, 312 F.3d at 112; *see also Davis*, 798 F.3d at 296 (finding "no reason that [the inmate] should not be entitled to rely on the representations of his jailers"). It also must be so misleading to a reasonable inmate as to interfere with his use of the grievance process. *Brown*, 312 F.3d at 113; *see also Townsend*, 898 F.3d at 783–84; *Davis*, 798 F.3d at 296. These requirements will ensure that "otherwise unexhausted claims . . . proceed only in . . . exceptional circumstance[s]." *Rinaldi*, 904 F.3d at 268.

As a subjective matter, the inmate must persuade the district court that he in fact did rely on the misrepresentation to his detriment. As in the threat context, *Rinaldi*, 904 F.3d at 268–69, objectively misleading instructions can be circumstantial evidence that an inmate's use of the grievance process has been thwarted, but a further showing—such as "documents, affidavits, or live testimony if deemed warranted," *id.* at 269—will typically be required. And in any event, that circumstantial evidence can be overcome by evidence that an inmate actually knew how to navigate the grievance process despite the misleading instructions. *Id.*; *cf. Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("When a

17

prisoner has no means of verifying prison officials' claims about the administrative grievance process, incorrect statements by officials may indeed make remedies unavailable.").

This test for assessing misrepresentations not only provides an administrable and consistent framework for the third category of "unavailability" under *Ross*: It also promotes Congress's goals in requiring exhaustion under the PLRA.[7] If the objective prong is the stick, discouraging prison staff from misleading inmates about the grievance process, the subjective prong is the carrot, encouraging prisons to impart knowledge of their grievance process by "reasonably communicat[ing]"

[7]Our focus here has been on the third category under *Ross*, namely, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 136 S.Ct. at 1860. But we would not want, by our silence with respect to the first *Ross* factor, to suggest that the misleading comment from Hardy's counselor was the only troubling aspect of the prison grievance process brought to light by this case. It bears emphasizing that the first *Ross* category, which deems exhaustion satisfied when the remedy in question "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates[,]" is aimed at preventing grievance procedures from becoming a needlessly difficult obstacle to inmates receiving needed relief. Here, in the face of confusing and evolving grounds for rejection, Hardy repeatedly requested relief for a manifestly serious medical complaint. To put it mildly, the present record does not reflect well on the prison's handling of it.

grievance procedures to inmates. *Small*, 728 F.3d at 271. And the result will be to encourage resolution of disputes "within the inmate grievance process," to weed out "frivolous prisoner lawsuits," and ultimately to "reduce the burden [of such lawsuits] on the federal courts." *Spruill*, 372 F.3d at 230.

## C. Application to Hardy

As we have established today, to defeat a failure-to-exhaust defense based on a misrepresentation by prison staff, an inmate must show (1) that the misrepresentation is one which a reasonable inmate would be entitled to rely on and sufficiently misleading to interfere with a reasonable inmate's use of the grievance process, and (2) that the inmate was actually misled by the misrepresentation. Applying that test here, Hardy has met his burden on both prongs.

First, the prison counselor's instruction that Hardy respond to his rejected grievances by "fill[ing] out another one and send[ing] it in," App. 187, satisfies the objective prong. It was made to him by his assigned counselor, the prison staff member to whom inmates were encouraged to make such inquiries and who was expected to have accurate information about the grievance process. It was also sufficiently misleading to interfere with a reasonable inmate's ability to navigate the grievance process. In effect, the counselor advised—just as in *Davis*—that the grievance process contained only a single step when it in fact required more. *See* 798 F.3d at 296 & n.2 (finding the appeals step of a grievance process unavailable when "there were [no] factual circumstances such that [the prisoner] reasonably should have known—despite the jail staff's misrepresentation otherwise—that the grievance process had a second step" (emphasis omitted)). And, while

19

not a "clear misrepresentation" because as the District Court noted, *Hardy*, 2019 WL 1756535, at *5, it was technically true that Hardy could have submitted an appeal on the same grievance form as his original grievance, it was a misrepresentation nonetheless for it omitted a key piece of information:  that Hardy was required to write the word "appeal" somewhere on the form. *See Brown*, 312 F.3d at 111–12 (finding prison staff's instructions misleading not only because they told a prisoner to wait for an investigation to be completed before filing his grievance, but also because they withheld the critical information that this investigation had been completed.)

Second, Hardy made the requisite showing under the subjective prong.  According to his testimony at the evidentiary hearing—credited by the District Court—he was "clearly aware a grievance process existed at Camp Hill," App. 11, but he was unaware that this grievance process required him to file an appeal.  As Hardy explained in his testimony, he did not receive a handbook when he first entered Camp Hill because he spent his first week in the infirmary where he was not permitted personal belongings, and he only signed the acknowledgment that he received the handbook because he was told it would be left in his prison block.  As it turned out, it was not there; his subsequent requests for it went unanswered; and his attempts to go to the library, the only place he could read a copy of the grievance manual, were rebuffed—twice.[8]  *Accord Townsend*, 898 F.3d at 783–84 (noting that a

---

[8] Even if Hardy had managed to get his hands on the grievance manual, this may only have added to his confusion:

misrepresentation was "magnified" because the prisoner was denied access to the library and thus had no way to "verify" the official's misstatements).

On the flip side, the defendants produced no evidence that Hardy was aware of the appeal requirement. The defendants conceded at oral argument that they have no basis to dispute Hardy's representation that Camp Hill does not permit inmates to have personal belongings in the infirmary and that Hardy did not receive the handbook when admitted. So unable to impute knowledge based on Hardy's access to the handbook or the grievance manual, defendants instead argue that Hardy should have known of the appeals requirement because he received rejections and because he had a duty "to take affirmative action to ascertain his rights and responsibilities under the grievance policy" by consulting other inmates and prison staff. Gov't Defs.' Br. 17.

Whether viewed as relevant to the objective or subjective prongs, these arguments only lend further support to Hardy.[9]

The manual states that rejected grievances must be appealed, but also allows for rejected grievances to be resubmitted.

[9] As presented, these arguments seem to pertain to the objective, not the subjective, prong. There are of course cases where it is so obvious what a reasonable person "should have known" as to support the inference of actual knowledge, i.e., that this party must have known. *See Kedra v. Schroeter*, 876 F.3d 424, 440, 441–42 (3d Cir. 2017) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). The defendants, however, do not articulate that argument. Instead, they appear to be arguing only as an objective matter that a reasonable inmate should

21

The grievance rejections provided an array of explanations, none of which was the failure to appeal, and they included no information or instruction about the next step an inmate should take; indeed, they did not even mention the word "appeal." In addition, Hardy did take "affirmative action to ascertain his rights": he asked his counselor, who misled him. It is no answer—where a prison has refused to provide an inmate with access to written information about the grievance process, provided no guidance in its rejections, and affirmatively misled the inmate—that the inmate should have sought advice from fellow prisoners. We will not "allow[] jails and prisons to play hide-and-seek with administrative remedies" in this manner, "keep[ing] all remedies under wraps until after a lawsuit is filed and then uncover[ing] them and proclaim[ing] that the remedies were available all along." *Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007).

In short, the prison had the duty in the first instance to "reasonably communicate[]" its policies to Hardy. *Small*, 728 F.3d at 271. Instead, it provided misleading instructions on which a reasonable inmate would rely and on which the undisputed record shows Hardy did rely to his detriment. All "available" remedies were exhausted.

---

have divined the appeals requirement from the rejections or from discussions with other inmates and thus would not have been misled. These arguments do not support an inference of actual knowledge on this record nor, for the reasons we explain, do they alter the objectively misleading nature of the counselor's statement.

\*\*\*

For these reasons, we will reverse the District Court's entry of summary judgment and remand for further proceedings consistent with this opinion.