**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2669
_____

JOSE MONTANEZ,
Appellant

v.

PAULA PRICE, Health Care Administrator SCI-Huntingdon;
RAJINDER MAHLI, SCI-Huntingdon; GABRIELLE
NALLEY, Physician's Assistant SCI-Huntingdon;
NURSE MEL; DR. VERNON PRESTON, SCI-Rockview;
RICHARD ELLERS, Healthcare Administrator
SCI-Rockview; DR. DAVID EDWARDS, SCI-Smithfield;
MARY PATTON, SCI-Smithfield; C. WAKEFIELD,
Superintendent SCI-Smithfield; N. DAVIS, Registered
Nursing Supervisor SCI-Huntingdon; JOHN RIVELLO;
WELLPATH CARE; STATE OF PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:22-cv-01267)
District Judge: Honorable Robert D. Mariani
_____

Argued on September 24, 2024

Before: KRAUSE, BIBAS, and AMBRO, *Circuit Judges*

(Opinion filed: October 8, 2025)

Samuel Weiss
Lilian Novak                    **[ARGUED]**
Rights Behind Bars
1800 M Street NW
Front 1 #33821
Washington, DC 20033

> *Counsel for Appellant*

Samuel H. Foreman
Keanna A. Seabrooks        **[ARGUED]**
Weber Gallagher Simpson Stapleton Fires & Newby
6 PPG Place, Suite 1130
Pittsburgh, PA 15222

> *Counsel for Medical Appellees/Appellees Rajinder Mahli, Gabrielle Nalley, Dr. Vernon Preston, Dr. David Edwards, Wellpath Care*

Jacob A. Frasch                **[ARGUED]**
Sean A. Kirkpatrick
Office of Attorney General of Pennsylvania
Strawberry Square 15th Floor
Harrisburg, PA 17120

Claudia M. Tesoro
Office of Attorney General of Pennsylvania
1600 Arch Street

Suite 300
Philadelphia, PA 19103

*Counsel for Commonwealth Appellees/Appellees*
*Paula Price, Nurse Mel, Richard Ellers, Mary Patton,*
*C. Wakefield, N. Davis, John Rivello, Commonwealth*
*of Pennsylvania*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

The protections afforded by the Eighth Amendment, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act (RA), 29 U.S.C. § 701 *et seq.*, do not stop at the prison gates. So when an inmate, whether counseled or pro se, claims that prison officials ignored his serious medical needs and failed to accommodate his disability, the courthouse doors must be open for a fair hearing. That was not the case for Appellant Jose Montanez, whose claims were dismissed with prejudice even though his complaint, liberally construed, states an Eighth Amendment claim against several defendants in their individual capacities, a claim under the RA against Wellpath Care LLC, and a claim under both the ADA and RA against the Commonwealth of Pennsylvania. As to his other claims, Montanez's pleading was insufficient, but his briefs in opposition to the defendants' motions to dismiss make clear that amendment would not have

3

been futile, so the District Court erred by not granting him leave to amend. We will therefore affirm the District Court in part, reverse in part, and remand with instructions to allow Montanez to amend his complaint in accordance with this opinion.

## I.     <u>Factual and Procedural History</u>[1]

On August 28, 2021, Jose Montanez stood up in his cell at SCI-Huntingdon and suddenly collapsed, his body numb from the chest down. Lying on the cell floor, Montanez alerted a nearby guard to his condition, and the guard soon returned with another prison officer. Montanez was then forced to "drag his body over to the cell door" before he was eventually taken to the medical unit in a wheelchair by Appellee Nurse Melanie Wagman. App. 37.

Once in the medical unit, Nurse Wagman took Montanez's vitals and felt around his legs. She then phoned Appellee Dr. Rajinder Mahli, who instructed her to move Montanez from his third-floor cell to a cell on the first floor and said he would evaluate Montanez the next day. When Montanez—still paralyzed from the waist down—learned that he would not be evaluated or treated until the next day, he

---

[1] Evidence adduced in discovery may not support or may affirmatively disprove the allegations in Montanez's complaint. In reviewing the dismissal of a complaint, however, we must accept the allegations as true. *Stringer v. Cnty. of Bucks*, 141 F.4th 76, 84, 90 (3d Cir. 2025). We therefore recount the facts below as set forth in the complaint, drawing all reasonable inferences in Montanez's favor, as required at this stage. *Id.*

asked to be taken to the hospital, but Nurse Wagman responded, "you're not going to the hospital," and laughed at the request. App. 38. Nurse Wagman then wheeled Montanez to the door of his new cell, where she ordered him to "get out of the wheelchair," offering him no assistance, forcing him to drag his limp body "across [his] cell to the bed," and leaving him "exhausted and in so much pain." App. 38.

The next day, Dr. Mahli came to examine Montanez, but he, too, did not enter the cell, and ordered Montanez to "walk for him." App. 38. Montanez was still unable to stand, let alone walk, so he again dragged his paralyzed body across the cell floor as Dr. Mahli watched. And when Montanez informed Dr. Mahli that he was also involuntarily urinating on himself, Dr. Mahli simply "nodded" and "walked off," doing nothing to help Montanez with his sudden paralysis or incontinence. App 38-39.

Montanez was then left alone in his cell in this condition—paralyzed from his chest to his feet and uncontrollably urinating on himself—for another three days before receiving medical attention. At that point, Montanez was finally given an MRI that revealed spinal cord stenosis and spinal cord edema, requiring expedited back surgery in September 2021. Following surgery, Montanez was transferred to a private rehabilitation facility.

A mere two weeks into rehabilitation and still unable to stand, Montanez was returned to detention, this time to the infirmary of a different Pennsylvania state prison, SCI-Rockview. There, he continued his recovery until he took a serious fall that caused him intense pain in his spine. Nonetheless, the doctor on staff, Appellee Dr. Vernon Preston,

5

refused to give him adequate pain medication. An x-ray revealed that Montanez had herniated a disc in his back in the fall, but SCI-Rockview's Healthcare Administrator, Appellee Richard Ellers, "lied" to his doctor "about the results of the x-ray" to delay his treatment. App. 39.

Two months later, Montanez was transferred back to SCI-Huntingdon, where he continued to suffer mobility issues and intense discomfort from his recent spinal surgery and subsequent spinal injury. So he requested certain accommodations, including a double mattress to control his back pain while sleeping, a cane or crutches to facilitate walking, stronger medication for pain management, and access to physical therapy. Those requests were repeatedly denied by prison personnel.

Eventually, Montanez looked to the courts for relief, filing a pro se complaint[2] in the United States District Court for the Middle District of Pennsylvania that sought compensatory and injunctive relief. The Complaint asserted claims under the Eighth Amendment, Title II of the ADA (Title II), 42 U.S.C. § 12132, and Section 504 of the RA (Section 504), 29 U.S.C. § 794. The defendants fell into two categories: (1) the Commonwealth of Pennsylvania and seven of its employees (collectively, the Commonwealth Defendants),[3] and

_____

[2] Montanez filed an initial complaint in August 2022 and an amended complaint, removing one defendant and adding another, in January 2023. For ease of reference, we will refer to the second filing as the "Complaint."
[3] The Commonwealth Defendants include the Pennsylvania Department of Corrections (Commonwealth) and (1) Paula

(2) Wellpath Care LLC (Wellpath), a private company contracted by the Commonwealth to provide medical services in its prisons, and four Wellpath employees (collectively, the Medical Defendants).[4]

What Montanez was permitted to say about these defendants and the facts supporting his claims, however, was

Price, the Health Care Administrator at SCI-Huntingdon; (2) Melanie Wagman, a nurse at SCI-Huntingdon; (3) SCI-Rockview Healthcare Administrator Richard Ellers; (4) Mary Patton, an employee at SCI-Smithfield; (5) SCI-Smithfield Superintendent C. Wakefield; (6) N. Davis, the registered nurse supervisor at SCI-Huntingdon; and (7) SCI-Huntingdon Superintendent John Rivello (collectively, the Individual Commonwealth Defendants).

[4] The Medical Defendants include Wellpath and (1) Dr. Rajinder Mahli; (2) Physician Assistant (PA) Gabrielle Nalley; (3) Dr. Vernon Preston; and (4) Dr. David Edwards (collectively, the Individual Medical Defendants). Although the Individual Medical Defendants are private contractors employed by a large, for-profit company, their work within the state prison system makes them state actors subject to suit under 42 U.S.C. § 1983. *See West v. Atkins*, 487 U.S. 42, 55 (1988). Unlike the Individual Commonwealth Defendants, however, the Individual Medical Defendants cannot assert qualified immunity. *Sanchez v. Oliver*, 995 F.3d 461, 467 & n.1 (5th Cir. 2021) (holding that Wellpath employees working in state facilities are "categorically ineligible for qualified immunity"); *Tanner v. McMurray*, 989 F.3d 860, 862 n.1, 870 (10th Cir. 2021) (same); *Davis v. Buchanan Cnty.*, 11 F.4th 604, 622 (8th Cir. 2021) (similar); *Clark v. Walker*, 865 F.3d 544, 550-51 (7th Cir. 2017) (similar).

strictly limited. At the time, the Middle District required pro se prisoners bringing civil rights claims to file their actions using a specific, court-issued complaint form. That document, entitled "FORM TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA," directed the filer, under the "statement of claim" section, to "[d]escribe how each defendant is involved, including dates and places," and to do so "as briefly as possible." App. 33, 36. And by "briefly," it meant within the twelve lines provided, or, if prisoners needed to say more, they could "[a]ttach no more than three extra sheets." *Id.* at 36. Montanez complied, filling out all twelve lines and writing out exactly three additional pages of allegations.

Not surprisingly, both the Commonwealth Defendants and the Medical Defendants then moved to dismiss the Complaint, arguing the allegations were insufficient to state a claim. Montanez's briefs in opposition to those motions included over 50 pages with new factual allegations about the ordeal he allegedly endured at SCI-Huntingdon, SCI-Rockview, and SCI-Smithfield since becoming paralyzed in 2021. But to no avail. The District Court granted the Commonwealth and Medical Defendants' motions to dismiss in full. Limiting its consideration to the "facts . . . expressly set forth in the . . . [C]omplaint," the Court concluded that Montanez failed to state an Eighth Amendment claim because he did not "allege facts from which it can reasonably be inferred that" any defendant "exhibited a deliberate indifference to his medical needs." App. 8 n.3, 22. It also dismissed Montanez's disability law claims on the grounds that Montanez failed to plausibly allege (1) that he was denied access to a covered program, service, or activity, as required to

8

state a claim under Title II or Section 504, *see* 42 U.S.C. § 12132; 29 U.S.C. § 794; or (2) that any defendant acted with deliberate indifference toward his right to be free from disability discrimination, as required to claim compensatory damages under those statutes. Finally, the District Court denied Montanez's request for leave to amend, concluding that amendment "would be futile based on the factual and legal defects identified in" the Complaint. App. 29.

Montanez timely appealed and is now represented by counsel.

## II. <u>Jurisdiction and Standard of Review</u>

The District Court had jurisdiction under 28 U.S.C. § 1331 and this Court has jurisdiction under 28 U.S.C. § 1291. We review an order granting a motion to dismiss de novo, meaning we "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Kedra v. Schroeter*, 876 F.3d 424, 440-41 (3d Cir. 2017) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). Because Montanez's Complaint was filed pro se, we also must construe it "liberally" and hold it to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Finally, we review a district court's denial of leave to amend for abuse of discretion and its determination of futility de novo. *U.S. ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014).

**III.    Discussion**

Montanez raises three claims on appeal.  He contends that the District Court erred by: (1) dismissing his Eighth Amendment claims; (2) dismissing his disability law claims under Title II and Section 504; and (3) dismissing the Complaint with prejudice rather than granting him leave to amend.  We address each claim in turn.

**A.    Eighth Amendment**

The Eighth Amendment requires prisons to provide humane conditions of confinement, including adequate food, shelter, clothing, and—as relevant to this appeal—medical care.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle*, 429 U.S. at 104.  An Eighth Amendment claim for inadequate medical care has both objective and subjective elements:  A prisoner "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

As for the first element, a medical need is sufficiently serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro* (*MCCII*), 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted).  As for the second, a prison official acts with "deliberate indifference" if he knows of the serious medical need yet disregards it by failing to act reasonably. *Farmer*, 511 U.S. at 837.  That knowledge can be inferred from circumstantial evidence, including the obviousness of the

10

serious health need, *id.* at 842, and we have found deliberate indifference in various contexts, "including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs," *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017).

Mere negligence, however—even if it constitutes medical malpractice—falls short of deliberate indifference. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). So does mere disagreement between the prisoner and medical personnel over the proper course of treatment. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

Here, Montanez's spinal cord stenosis and edema (which caused paralysis requiring surgery), his sudden incontinence, and the herniated disc he suffered after falling at SCI-Rockview easily qualify as serious medical needs. *See, e.g.*, *Durham v. Kelley*, 82 F.4th 217, 222, 229 (3d Cir. 2023) (lumbar stenosis is a serious medical need); *Spruill*, 372 F.3d at 236 (back condition that caused both "excruciating pain" and multiple falls was serious medical need); *McDaniel v. Syed*, 115 F.4th 805, 816, 832-33 (7th Cir. 2024) (prisoner with "spine and incontinence issues, resulting in significant back pain and difficulty controlling urination," had serious medical needs). Thus, Montanez's ability to state a claim for inadequate medical care turns on whether he has sufficiently pleaded deliberate indifference to any of these serious medical needs.

11

### i.    The Medical Defendants

#### a)    *The Individual Medical Defendants*

The District Court concluded that Montanez did not plausibly allege that any Individual Medical Defendant was deliberately indifferent to his health needs. That determination, at least as it pertains to Dr. Mahli, was simply incorrect.

According to the Complaint, Dr. Mahli, despite knowing that Montanez was suddenly paralyzed and uncontrollably urinating on himself, provided *no* medical treatment and instead abandoned Montanez in this state for three days. Taken as true, these allegations do not represent mere disagreement with Dr. Mahli's "medical judgment" or a particular "course of treatment." *Montanez v. Price*, No. 3:22-CV-1267, 2023 WL 5435616, at \*9-\*10 (M.D. Pa. Aug. 23, 2023). Rather, where "knowledge of the need for medical care is accompanied by the intentional refusal to provide that care," as alleged here, "the deliberate indifference standard has been met." *MCCII*, 834 F.2d at 346 (citation modified). That standard can also be met by a defendant abandoning a prisoner in a condition that unreasonably exposes him to "the threat of tangible residual injury," as may be inferred from the allegations in the Complaint against Dr. Mahli. *Spruill*, 372 F.3d at 235 (quoting *MCCII*, 834 F.2d at 346).

On top of stating an Eighth Amendment claim against Dr. Mahli for inadequate medical care, the Complaint adequately pleads a second type of Eighth Amendment violation. Construing Montanez's pro se Complaint "liberally,

12

as we must," *Durham*, 82 F.4th at 230, the facts alleged against Dr. Mahli—deserting Montanez in his cell with nothing to do but drag his urine-soaked, paralyzed body around his cell floor for three days before help arrived—are also sufficient to make out an unsanitary conditions-of-confinement claim, *see Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam) (forcing prisoner to live in his excrement for six days obviously violated the Eighth Amendment); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("It would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days . . . .").

Yet while the Complaint states an Eighth Amendment claim against Mahli, it fails to state such a claim, even when liberally construed, against the remaining Individual Medical Defendants—namely, Dr. Preston, Dr. Edwards, and PA Nalley. As to these defendants, the Complaint alleges (1) that Dr. Preston denied Montanez "proper or adequate pain medication" after he fell and herniated his disc; (2) that PA Nalley refused to give him a double mattress (which Montanez believed would help his back pain), denied him "stronger pain medication," "lied to [him]" about being referred to physical therapy, and allowed him to "walk around without a cane or crutches"; and (3) that Dr. Edwards denied his requests for "stronger pain medication and a double mattress," and refused to order an MRI for Montanez's left hip. App. 39-40. But those allegations reflect differences in judgment between Montanez and these medical personnel about appropriate medical treatment, or at most amount to medical malpractice, neither of which is cognizable under the Eighth Amendment. *Estelle*, 429 U.S. at 106; *Spruill*, 372 F.3d at 235.

13

b)      *Wellpath*

The District Court correctly determined that Montanez failed to state a claim under § 1983 against Wellpath. The Complaint mentions Wellpath once, alleging merely that it is the "entity contracting the medical staff who is also in this case." App. 40. But Wellpath cannot be held vicariously liable for the acts of its employees—Dr. Mahli, Dr. Preston, Dr. Edwards, and PA Nalley—under a theory of respondeat superior. *See Natale*, 318 F.3d at 583-84. Rather, like municipalities, private corporations under contract to provide prison health services are liable only if their policies or customs caused the constitutional violation. *See id.*; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Because Montanez does not tie any of the alleged Eighth Amendment violations back to Wellpath's policies or customs, he has failed to state a claim against that entity.

\*      \*      \*

In sum, the District Court erred by dismissing Montanez's Eighth Amendment claim against Dr. Mahli. While it correctly determined that Montanez's three-and-a-half-page, handwritten Complaint failed to state Eighth Amendment claims against Dr. Preston, Dr. Edwards, PA Nalley, and Wellpath, the District Court erred in dismissing those claims with prejudice. Instead, as discussed further below, Montanez should have been granted an opportunity to amend. *See infra* Section III.C.

14

ii.      The Commonwealth Defendants

The District Court properly dismissed Montanez's Eighth Amendment claims insofar as Montanez sought damages against the Commonwealth and the Individual Commonwealth Defendants in their official capacities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). It erred, however, in its treatment of the Individual Commonwealth Defendants in their personal capacities.

a)      *Nurse Wagman*

The District Court dismissed Montanez's Eighth Amendment claim against Nurse Wagman, reasoning that the allegations against her "amount[] to a mere disagreement with [the] medical treatment" she provided. *Montanez*, 2023 WL 5435616, at *7. Not so.

After Montanez collapsed and lost sensation from the chest down, Nurse Wagman allegedly provided no medical treatment other than briefly feeling around Montanez's legs. Nor did she try to diagnose Montanez's sudden paralysis. Instead, according to the Complaint, she laughed at his request to go to the hospital and, after transporting him to his new first-floor cell, did not help him into his cell and bed. As even the Commonwealth acknowledged at oral argument, assuming the truth of Montanez's allegations, Nurse Wagman simply "dumped him in [his] cell," leaving Montanez to drag his limp body as he crawled across his cell floor. Oral Arg. Transcript 35:18. The Commonwealth itself "[could]n't defend [that] decision to make him crawl," Oral Arg. Transcript 37:3-4, which unnecessarily exposed Montanez "to the possible risks

15

of a permanent disability or . . . serious injury," *Spruill*, 372 F.3d at 237.

That is textbook deliberate indifference. Such conduct, as described, "entails the obduracy and wantonness that is proscribed by the Eighth Amendment" and is thus sufficient to state a claim against Nurse Wagman. *Pearson*, 850 F.3d at 537, 541 (holding that a prisoner's claim that a nurse forced him "to crawl to a wheelchair despite indicating that he was unable to walk" created a genuine issue of fact as to whether the nurse "acted with deliberate indifference" to the prisoner's serious medical needs).

### b)     *Non-Medical Prison Officials*

Non-medical personnel generally will not be found deliberately indifferent for purposes of an Eighth Amendment inadequate-medical-care claim unless they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill*, 372 F.3d at 236. Put differently, when a "prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id.*

Here, it is undisputed that Ellers, Price, Rivello, Wakefield, and Patton are not medical personnel, and that Montanez was under the care of medical professionals during his time at FCI-Huntingdon and FCI-Rockview. So to sustain his Eighth Amendment claims against those five individuals, Montanez had to allege that they had "reason to believe or (actual knowledge)" that the medical staff were "mistreating (or not treating)" him. *Id.* Even Montanez concedes that he

16

failed to make such allegations as to four of the five, namely, Price, Rivello, Patton, and Wakefield.[5]

Ellers is a different story. According to the Complaint, although Montanez's x-ray after the fall showed that he had herniated a disc in his back, Ellers knew and "lied about the results of the x-ray," misinforming Montanez's doctors that the results were negative and thus preventing Montanez from receiving timely treatment. App. 39. Those allegations, taken as true, are sufficient to show that Ellers had "actual knowledge . . . that prison doctors or their assistants [were] mistreating (or not treating)" Montanez's serious medical need. *Spruill*, 372 F.3d at 236; *see also Rouse*, 182 F.3d at 197 (deliberate indifference sufficiently pleaded where defendant knew of plaintiff-prisoner's "need for medical treatment" and prevented him "from receiving [that] treatment" for "a non-medical reason").

The District Court thus erred in dismissing the Eighth Amendment claims against Wagman and Ellers. And although it correctly determined that Montanez had failed to state claims against the other Individual Commonwealth Defendants, those claims, too, should not have been dismissed with prejudice. *See infra* Section III.C.

### B. Disability Law Claims

For decades, the ADA and the RA have served as "twin pillars of federal disability discrimination law," working in

---

[5] Similarly, although Davis is a medical professional at SCI-Huntingdon, Montanez concedes that he failed to include any specific allegations as to Davis in the Complaint.

tandem to "secure the rights of individuals with disabilities to independence and full inclusion in American society." *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 109-10 (3d Cir. 2018). Functionally, the ADA and the RA impose the "same prohibition," but they cover different entities. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 159 (2017). Along with proscribing discriminatory animus, both statutes also impose on covered entities an affirmative obligation to make "reasonable accommodations" for persons with disabilities so that they can meaningfully access their programs, services, and activities. *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see Tennessee v. Lane*, 541 U.S. 509, 532-33 (2004). As then-Judge Jackson has observed, this duty is at its apex in the prison context "because inmates necessarily rely totally upon [prisons] for all of their needs while in custody and do not have the freedom to obtain such services (or the accommodations that permit them to access those services) elsewhere." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015).

i. Who Can Be Sued Under Title II and Section 504

Here, the District Court dismissed Montanez's Title II and Section 504 claims against all of the defendants—the Individual Commonwealth Defendants, the Individual Medical Defendants, the Commonwealth, and Wellpath. In reviewing that decision, we consider first which defendants, if any, are subject to suit under either statute.

As relevant here, Title II of the ADA prohibits a "public entity" from discriminating against disabled people, including by denying them equal access to their "services, programs, or

18

activities." 42 U.S.C. § 12132. "Public entity" includes "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority." *Id.* § 12131(1).

Section 504, in contrast, reaches only recipients of "[f]ederal financial assistance." 29 U.S.C. § 794(a). This "covers those who receive the aid" directly from the federal government or indirectly through another recipient of that aid. *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 606-07 (1986); *see* 28 C.F.R. § 42.540(e) ("Recipient means any . . . public or private entity . . . to which Federal financial assistance is extended directly or through another recipient . . . ."). "[F]ederal financial assistance," in turn, includes federal grants, loans, non-procurement contracts, and "reimbursement through Medicare and Medicaid." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 217 (2022); *see* 28 C.F.R. § 42.540(f) (defining "Federal financial assistance" as "any grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), . . . or any other arrangement by which" the recipient receives federal funds, services, or property); 34 C.F.R. § 104.3(h) (similar); 45 C.F.R. § 84.10 (similar). And the purpose for which that financial assistance was intended is irrelevant because a recipient of federal financial assistance must comply with Section 504 in "*all* of [their] operations," not just the program or activity receiving the funding. 29 U.S.C. § 794(b) (emphasis added); *see* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 4, 102 Stat. 28, 29-30 (1988).

Given these limitations, the Individual Commonwealth and Individual Medical Defendants are not subject to suit in their personal capacities.[6] Neither state employees nor contractors are "public entities," so they cannot be sued under Title II. *See Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) (per curiam) (dicta); *see also Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015); *Garcia v. S.U.N.Y. Health Scis. Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001). And because "the individual defendants do not receive federal aid," they also cannot be liable under Section 504. *Emerson*, 296 F.3d at 190.

The Commonwealth, on the other hand, is a public entity and receives federal funds, so it is a proper defendant under both Title II and Section 504. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the statutory definition of 'public entity.'"); *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-93 (3d Cir. 2019) (allowing Title II and Section 504 claims against the Commonwealth to proceed).

As for Wellpath, the results are mixed. There is no question that it cannot be sued under Title II. Even though Wellpath contracts with the Commonwealth to perform a traditional government function—providing medical services to state prisoners—that alone is not enough to transform a private corporation into an "instrumentality of a State." 42

---

[6] Although individuals can be sued for damages in their official capacities under Section 504 and Title II, these claims are simply treated as if they are against the public entity or recipient of federal funds that employs the individual. *Durham v. Kelley*, 82 F.4th 217, 224 n.11, 227 & n.33 (3d Cir. 2023).

20

U.S.C. § 12131(1); *see Edison v. Douberly*, 604 F.3d 1307, 1309-10 (11th Cir. 2010) (concluding that a private prison management corporation operating a state prison is not a public entity); *Green v. City of New York*, 465 F.3d 65, 78-79 (2d Cir. 2006) (holding that a private hospital providing services pursuant to a municipal contract is not a public entity). So the ADA claim against Wellpath was properly dismissed.

But unless and until discovery establishes otherwise, Wellpath remains a proper defendant on the Section 504 claim. Montanez's Complaint alleges that, on "information and belief, SCI-Huntingdon [and the] Pennsylvania Department of Corrections receive[] federal funding," App. 44, and that Wellpath is the "Medical Contractor at SCI-Huntingdon," App. 35. Thus, liberally construed, the Complaint alleges that Wellpath is an indirect recipient of federal funds. *See Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152, 161 & n.7 (3d Cir. 2001) (explaining that "an entity may receive federal financial assistance indirectly and still be considered a recipient for purposes of Title IX," which "prohibits discrimination based on disability in substantially the same terms" as Section 504). Wellpath disputes this point, but that cannot be resolved at the motion-to-dismiss stage, where we

21

must accept the allegations as true.[7]  *See Stringer v. Cnty. of Bucks*, 141 F.4th 76, 84, 90 (3d Cir. 2025).  As it currently stands, Wellpath is a proper defendant under Section 504.  *See* 29 U.S.C. § 794(b)(3)(A)(ii) (requiring a "corporation . . . or other private organization . . . which is principally engaged in the business of providing . . . health care" to refrain from disability discrimination in "all of [its] operations" if it directly or indirectly receives any "Federal financial assistance").

---

[7] On the one hand, in its answering brief, Wellpath represented that it does not "receive federal funds."  Medical Appellees' Answering Br. 20 n.2.  On the other hand, that statement conflicts with court filings and government websites that indicate Wellpath directly receives federal financial assistance.  *See, e.g.*, U.S. Dep't of Agric., *Distance Learning & Telemedicine Grants FY 2023*, at 4, https://perma.cc/5Y5S-54A5 (awarding "Wellpath, LLC" a federal grant); *see also Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (explaining that we can take judicial notice of "publicly available [information] on government websites").  In advance of oral argument, this Court advised the parties to be prepared to address this issue.  But oral argument did not bring clarity.  Instead, Wellpath's counsel, after initially representing that Wellpath has never directly or indirectly received federal funds of any kind, then acknowledged that she could not explain the public documents to the contrary and that she had not, in fact, investigated the matter.  And after representing that she would follow up with her client and submit supplemental briefing, she failed to do so, requiring us, two weeks later, to formally order Wellpath to submit that briefing.  What Wellpath then provided also failed to engage, much less resolve, the conflict between its blanket denials and the public records.

ii.      Montanez States Disability Law Claims
Against the Commonwealth and Wellpath

Except for causation, the substantive standards for determining liability under Section 504 and Title II are identical, and the same remedies are available under both Acts.[8] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014); 29 U.S.C. § 794a (authorizing injunctive relief and money damages) 42 U.S.C. § 12133 (same). To state a claim for disability-based discrimination, a plaintiff must show that: (1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or other activities for which a public entity is responsible, or was otherwise subjected to discrimination by a public entity; (4) by reason of his disability. *Harberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018). In this case, the District Court erred in dismissing the disability law claims against the Commonwealth and Wellpath because the Complaint establishes a prima facie case of disability discrimination.

We agree with the District Court that the first two elements are satisfied. Montanez, like all state prisoners, is a qualified individual covered by Title II and Section 504. *Durham*, 82 F.4th at 225. And a "disability" is any "physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), which

---

[8] "[U]nder the RA, the disability must be the sole cause of the discriminatory action, while the ADA only requires but-for causation." *Durham*, 82 F.4th at 226. This distinction is irrelevant here, however, because the Complaint establishes causation under either standard.

includes, among other things, "caring for oneself, . . . sleeping, walking, standing," *id.* § 12102(2)(A), and "the operation of a major bodily function," such as "functions of the . . . bladder," *id.* § 12102(2)(B). So Montanez's spinal cord stenosis, spinal edema, incontinence, and herniated disc undoubtedly qualify as disabilities. *See Durham*, 82 F.4th at 225 ("lumbar stenosis" is a disability).

As to the third element, however, we cannot agree with the District Court's conclusion that Montanez "wholly fails to allege that he was denied or excluded from any services, programs, or activities." *Montanez*, 2023 WL 5435616, at *11. The phrases "service, program, or activity" under Title II and "program or activity" under Section 504 are "extremely broad in scope and include[] anything a public entity does." *Furgess*, 933 F.3d at 289 (quoting *Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015)); *see also* 29 U.S.C. § 794(b)(1)(A) (defining "program or activity" under Section 504 as "all of the operations of . . . a department, agency, . . . or other instrumentality of a State"). Under this "all-encompassing" definition, *Yeskey v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir. 1997), *aff'd sub nom. Yeskey*, 524 U.S. 206, the Complaint plausibly alleges that Montanez was denied equal access to at least three different programs or services.

*First*, health care is a quintessential service prisons must provide to prisoners. *See Yeskey*, 524 U.S. at 210. True, as the Commonwealth points out, failure to provide adequate medical care to a disabled inmate does not, on its own, give rise to

24

liability under the ADA or RA.[9] *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. . . . The ADA does not create a remedy for medical malpractice."). But Montanez alleges not merely that he was denied specific medical care *for his disabilities*. Rather, according to the Complaint, Montanez had to drag his paralyzed body on two different occasions to get access to medical care—once to get access to the medical unit on the day he became paralyzed, and again the next day to reach Dr. Mahli, who refused to enter his cell to examine him. Put differently, Montanez alleges he was denied meaningful access to "medical care" *because of his disabilities*, which is cognizable under Section 504 and Title II. *See United States v. Georgia*, 546 U.S. 151, 157 (2006).

*Second*, the necessities for hygiene, including, showers, sinks, and toilets, are basic services prisons must provide. *See id.* at 155, 157; *Furgess*, 933 F.3d at 289-90. According to Montanez's Complaint, he was abandoned in his cell for at least three days, paralyzed and urinating on himself, neither able to reach a toilet nor given an alternative way to relieve himself with dignity. This is a textbook example of a disabled prisoner being denied access to fundamental prison service.

---

[9] Of course, because Title II gives disabled individuals a cause of action whenever they are denied equal access to "the services, programs, or activities of a public entity" because of their disability *or* "subjected to discrimination by any such entity," if a prison's failure to provide treatment was fueled by discriminatory animus toward a prisoner's disability, that would give rise to liability under the ADA. 42 U.S.C. § 12132.

25

*See McDaniel*, 115 F.4th at 823 ("In a prison, qualifying programs and activities include meals, medical care, showers, toilets, and the like."); *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022) ("We have no difficulty concluding that a handicapped-accessible toilet for disabled prisoners amounts to a service, the denial of which could establish a claim under either statute.").

*Third*, given that all people need sleep, providing prisoners with accessible beds and "appropriate and adequate bedding . . . are 'services' of" a prison. *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1224 n.44 (9th Cir. 2008); *see Hall v. Higgins*, 77 F.4th 1171, 1181 (8th Cir. 2023) ("[A j]ail's toilets, beds, and medical care are a 'service' under the ADA."). Here, Montanez alleges that, on the first day of his paralysis, Nurse Wagman, rather than helping him to his bed or providing him with a handicap-accessible sleeping arrangement, simply dumped him in his cell and forced him to drag his paralyzed body across the floor and into his bed. And when he returned to SCI-Huntingdon after herniating a disc while recovering from major back surgery, his back condition—coupled with the lack of adequate pain medication—caused significant pain whenever he lay on his single mattress. That, in turn, interfered with his ability to sleep. But his requests for an accommodation, such as a double mattress, were repeatedly denied. So construing the Complaint liberally, Montanez adequately pleaded that he could not access a bed on the same basis as "able-bodied inmates" and was denied a reasonable accommodation necessary for him to sleep without significant pain—"just like able-bodied inmates" could. *Furgess*, 933 F.3d at 291.

26

A plaintiff can meet the fourth element of a prima facie case—discrimination "by reason of his disability"—by showing invidious discrimination or a failure to provide reasonable accommodations. *Harberle*, 885 F.3d at 179-80. Montanez proceeds down the second path, arguing persuasively that the Commonwealth and Wellpath had an obligation to reasonably accommodate his disabilities and that its repeated failure to do so was the reason he could not meaningfully access various prison services.

The duty to accommodate is triggered when a disabled person's need for an accommodation becomes known, either because (1) he requests an accommodation or (2) his disability and concomitant need for an accommodation are open and apparent. *See Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197-98 (10th Cir. 2007) (collecting cases). Here, once Montanez suddenly became paralyzed, his disability and resulting limitations were obvious to prison staff, including Dr. Mahli and Nurse Wagman. And during his second stint at FCI-Huntingdon, his accommodation requests, including for mobility aids and a double mattress or other bedding accommodations, "were repeatedly refused." *Durham*, 82 F.4th at 226. So the Commonwealth and Wellpath had an affirmative duty to accommodate Montanez, and its failure to do so was "tantamount to denying [him] access" to those prison services "on the same basis as other inmates." *Id.*

In sum, a prison's "toilets, beds, and medical care are a 'service'" or program under Title II and Section 504, and Montanez has adequately pleaded that he was denied access to all three by reason of his disability. *Hall*, 77 F.4th at 1181. The Complaint therefore states a Title II and Section 504 claim

27

against the Commonwealth and a Section 504 claim against Wellpath, and the dismissal of those claims was error.

iii.      <u>Montanez Has Pleaded Entitlement to Compensatory Damages</u>

To recover compensatory damages for a Section 504 or Title II violation, a plaintiff must plead, in addition to the elements of a prima facie case, that the discrimination was "intentional" in the sense that it was more than mere disparate impact. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261-62 (3d Cir. 2013). Deliberate indifference satisfies this requirement, which, in the disability law context, consists of (1) knowledge that the plaintiff's federally protected right to be free from disability discrimination was likely to be violated, and (2) "failure to act despite that knowledge." *Id.* at 263-65 (emphasis omitted); *see also Furgess*, 933 F.3d at 292.

Montanez's Complaint sufficiently pleads that various prison and medical staff had the requisite knowledge yet failed to act. According to the Complaint, for instance, Nurse Wagman knew Montanez was paralyzed but abandoned him on the floor of his cell, and Dr. Mahli—despite knowing that Montanez could neither stand nor walk and was involuntarily urinating on himself—took no steps to assist or accommodate Montanez. Likewise, Price, PA Nalley, and Dr. Edwards allegedly knew of Montanez's disabilities but denied his requests for accommodations and did not provide him with any alternatives. These allegations, if proven, amount to deliberate indifference. *See Durham*, 82 F.4th at 226 (prisoner with "lumbar stenosis" pleaded deliberate indifference by alleging that "[h]e made numerous prison officials aware that he . . .

28

needed a cane to walk[] and was in severe pain without it" but "was continuously denied his cane and shower accommodations"); *Furgess*, 933 F.3d at 292 (prisoner successfully pleaded Commonwealth was deliberately indifferent by alleging medical and prison staff "knew that [he] required a handicapped-accessible shower" and they "did not provide him with any accommodation that would allow him to shower" for months).

The Commonwealth contends that it cannot be liable for any Title II and Section 504 violations of the Medical Defendants because they are contractors, not government employees. But that misapprehends the reach of those remedial statutes. As our sister circuits have consistently recognized and as we hold today,[10] both their text and purpose confirm the Commonwealth's obligation to ensure compliance

---

[10] *See, e.g.*, *Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1097-98 (10th Cir. 2020) (explaining that the state prison "farm[ing] out operations to others . . . would not prevent liability" under the ADA or RA); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065-67, 1074 (9th Cir. 2010) (concluding that "even in the absence of a regulation explicitly saying so," the "fairest reading" of Title II and Section 504 required state defendants to ensure private and local prison operators complied with both statutes because "a State cannot avoid its obligations under [either Act] by contracting with a third party to perform its functions"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286-87 (2d Cir. 2003) (holding that Section 504 imposes "supervisory liability" on states accepting federal funds to "guarantee that those it delegates to carry out its programs . . . compl[y] with" the RA).

29

with Title II and Section 504 even when it contracts out the operation of their programs, services, or activities to third parties.

We start with the text.[11] Title II's and Section 504's broad language—covering all public-entity "services, programs, or activities" and "any" federally funded "program or activity"—contains no exception when such programs, services, or activities are administered through contractors. Said differently, Congress wanted to give people with disabilities an affirmative right to access *all* covered programs and services no matter *how* or *through whom* the government or federally funded entity elects to deliver them. Regardless of the medium of delivery, those programs and services must be accessible to people with disabilities.

Congress's use of the "passive voice ('no qualified individual with a disability shall, by reason of such disability, be excluded . . .') only reinforces that conclusion." *A. J. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 358 (2025) (Sotomayor, J., concurring) (quoting 42 U.S.C.

---

[11] Title II states: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 likewise provides, in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

30

§ 12132). Here, both statutes "focus[] on an event" that constitutes a type of prohibited disability discrimination—a disabled person being excluded from participating in or being denied the benefits of a covered program, service, or activity because of their disability—"without respect to a specific actor." *Dean v. United States*, 556 U.S. 568, 572 (2009). This linguistic choice to "pull[] the actor off the stage" reflects Congress's "agnosticism" as to who does the excluding or denial of benefits—be they government employees or government contractors. *Bartenwerfer v. Buckley*, 598 U.S. 69, 75-76 (2023).

The second clause of Title II, which goes on to separately protect people from being "subjected to [disability] discrimination by any" public entity, 42 U.S.C. § 12132, demonstrates that "Congress knew how to write . . . a law" that cabined liability in the way the Commonwealth proposes and deliberately "did not do so" in the first clause of Title II. *Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*, 596 U.S. 880, 887 (2022). Thus, as we recently observed as to Title II, covered entities "may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of . . . discriminating on the basis of disability." *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 548 (3d Cir. 2024) (citation modified); *see also* 28 C.F.R. § 35.130(b)(1) (prohibiting a public entity under Title II from discriminating on the basis of disability "directly or through contractual, licensing, or other arrangements"); 28 C.F.R. §§ 41.51(b)(1), 42.503(b)(1) (same for federal funding recipients under Section 504).

Finally, the Commonwealth's attempt to evade the language of the statutes would also undermine their goals. As

31

"a remedial statute, meant to bring an end to discrimination against individuals with disabilities in all aspects of American life," the ADA "must be construed with all the liberality necessary to achieve [its] purpose[]." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 635 F.3d 87, 94 (3d Cir. 2011).[12] Section 504, which we interpret in lockstep, must likewise be broadly construed to effectuate its remedial purpose of eliminating disability discrimination wherever federal funds are involved. 29 U.S.C. § 701(a)-(c); *see Yeskey*, 118 F.3d at 170 ("Congress has *directed* that Title II of the ADA be interpreted in a manner consistent with Section 504 . . . ."). And state prisons are quintessential covered entities under both statues: only the states—public entities that receive federal funds—have the power to incarcerate people in prisons within their borders.

Yet, as this case illustrates, states often contract with private companies to provide prison services and programs, including medical and mental health care, pharmaceutical services, drug treatment and substance abuse programs, transportation services, facility operations, vocational programs, food services, and security. *See* 28 C.F.R. pt. 35, App. A (effective Mar. 11, 2011). So if states could evade their statutory duties merely by outsourcing the operation of such programs, Title II and Section 504 would become dead letter within state prisons—an outcome antithetical to Congress's "unmistakabl[e]" intent to "include[] State prisons and prisoners within" the statutes' coverage. *Yeskey*, 524 U.S. at

---

[12] *See also* 42 U.S.C. § 12101(b)(1) (explaining that the ADA's "purpose" is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities").

209. And the Commonwealth's interpretation is not limited to the prison context. Under the Commonwealth's reading, a state could avoid complying with either statute and simultaneously insulate itself from liability simply by contracting out the operation of all its programs, services, and activities and burying its head in the sand. But as the statutory text and case law make clear, "Congress did not design the ADA or the RA so that a public entity could forever prevent a qualified individual with a disability from utilizing a service, program, or activity." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1107 (10th Cir. 2019).

\* \* \*

In short, whether or not they use contractors, states remain responsible for ensuring that disabled prisoners can access their prisons' services, programs, and activities on the same basis as non-disabled prisoners. *See Williams*, 117 F.4th at 548.[13] And as applied here, that means the Commonwealth was "obligated to ensure that [Wellpath and its employees]—like all other State contractors—complie[d] with federal laws prohibiting discrimination on the basis of disability." *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013). It was therefore error for the District Court to dismiss the ADA and

---

[13] *See also* 28 C.F.R. § 35.152(a) (Title II applies to "public entities that are responsible for the operation or management of . . . correctional facilities . . . either directly or through contractual, licensing, or other arrangements with public or private entities, in whole or in part . . . ."); 28 C.F.R. pt. 35, App. A ("If a prison is occupied by State prisoners and is inaccessible, the State is responsible under title II of the ADA.").

RA claims against the Commonwealth and the RA claim against Wellpath. Those claims, including Montanez's request for compensatory damages, survive the motions to dismiss.

## C. Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) directs courts to grant motions for leave to amend "when justice so requires." So leave to amend should be liberally given unless amendment would be inequitable or futile. *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004); *Phillips*, 515 F.3d at 245. And because courts have a special obligation to be "more forgiving of *pro se* litigants," *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019), this Circuit has a "longstanding policy of allowing *pro se* plaintiffs to amend their complaints before the court rules upon defendants' motions to dismiss," *Roman v. Jeffes*, 904 F.2d 192, 196 n.8 (3d Cir. 1990) (collecting cases).

Despite correctly reciting this standard, the District Court nonetheless denied Montanez's request for leave to amend, concluding that amendment "would be futile based on the factual and legal defects" in Montanez's Complaint. *Montanez*, 2023 WL 5435616, at \*11. This was an abuse of discretion for two reasons.

*First*, the inadequacies in Montanez's pleading largely stemmed from the Middle District's own procedures. Montanez was required to file his complaint on the "FORM TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA." App. 33. And at the time, that form instructed pro se prisoners to state "as briefly as possible the

34

facts of your case," provided twelve lines on the form in which to do so, and warned that the prisoner could "[a]ttach no more than three extra sheets if necessary" to detail his allegations. App. 36-37. That constraint was particularly problematic for plaintiffs like Montanez, who were attempting to assert complex constitutional and statutory civil rights claims against numerous defendants based on conduct that occurred in different facilities.

Perhaps recognizing the due process implications of such a restriction, the Middle District has since eliminated the page limit.[14] But that change was too little, too late, for Montanez. By forcing him to state his claims in under four handwritten pages, the Court itself set him up for failure at the motion-to-dismiss stage, so Montanez should have the chance to amend as to any potentially viable claims. *See* Fed. R. Civ. Pro. 15(a)(2).

*Second*, this is not a situation where amendment would be futile.[15] Leave to amend is futile if "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). But as we explained above, even Montanez's

---

[14] The form now instructs prisoners to include "all the facts you consider important" and permits them to attach as many "additional pages [as] needed." U.S. Dist. Ct. for the Middle Dist. Pa., *Instructions for Filing a Complaint Pro Se*, at 8, https://perma.cc/3T8W-DWTQ.

[15] The District Court's failure to provide any substantive analysis supporting its futility conclusion also borders on an abuse of discretion. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 276 (3d Cir. 2001).

artificially truncated Complaint stated cognizable claims under Title II, Section 504, and the Eighth Amendment against some defendants. Thus, granting him leave to amend to bolster these claims would not have been futile. *See Geness v. Cox*, 902 F.3d 344, 361 (3d Cir. 2018) (no futility if plaintiff has already stated a claim).

Plus, Montanez's briefs in opposition to the motions to dismiss included over 50 pages with additional factual allegations in support of his claims against all named defendants, including those defendants whom Montanez could not adequately discuss in his Complaint due to the page limit. Although these briefs cannot amend the Complaint directly, *see McArdle v. Tronetti*, 961 F.2d 1083, 1089 (3d Cir. 1992), they function, in effect, as a proffer of the additional allegations Montanez could make if permitted, *see Gordon v. Kartri Sales Co.*, No. 3:17-CV-00320, 2018 WL 1123704, at *3 (M.D. Pa. Mar. 1, 2018) (collecting cases where courts "granted leave to amend a pro se plaintiff's complaint whe[n] the plaintiff has introduced new facts in his opposition papers" that might be helpful for stating a claim). And that proffer makes clear that amendment would not be futile. *Weaver v. Wilcox*, 650 F.2d 22, 27 (3d Cir. 1981) ("Pro se plaintiffs should be given an opportunity to amend their complaints unless it clearly appears that the deficiency cannot be overcome by amendment.").

Accordingly, denying Montanez leave to amend was an abuse of discretion and should be corrected on remand.

## IV.    Conclusion

Pro se complaints—however inartfully pleaded—must be carefully considered, for while prisoners surrender many

36

liberties upon conviction, the right to access the courts and seek redress for constitutional and statutory violations is not one of them. We will therefore (1) reverse the District Court's dismissal of Montanez's Eighth Amendment claims against Dr. Mahli, Nurse Wagman, and Administrator Ellers, the Title II and Section 504 claims against the Commonwealth, and the Section 504 claim against Wellpath; (2) affirm the District Court's dismissal of the Eighth Amendment claims against the Commonwealth and Individual Commonwealth Defendants in their official capacities, the disability law claims against the Individual Commonwealth and Medical Defendants, and the ADA claim against Wellpath; and (3) remand with instructions to permit Montanez to amend his Complaint.